JOSEPH A. GOMES, ESQ., AAL LLC
Hawaii State Bar No. 6789
PACIFIC JUSTICE INSTITUTE
1175 Nuuanu Avenue
Suite 105, No. 37475
Honolulu, Hawaii  96837
Telephone:  808-780-4179
Email: jgomes@pji.org

Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| SUSAN F. McGINN, | § | Civil No.: _____ |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | **Complaint; Jury Demand; Summons** |
| HAWAII SYMPHONY ORCHESTRA; | § | |
| MUSICIANS' ASSOCIATION OF | § | |
| HAWAII, LOCAL 677, AMERICAN | § | |
| FEDERATION OF MUSICIANS; AND | § | |
| DOES 1-20, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT

Comes now Plaintiff, SUSAN F. McGINN, by and through the undersigned

Counsel, and for her Complaint against the above-named Defendants, alleges and

avers as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to:

   - Title I of the Americans with Disability Act, as codified, 42 U.S.C. §§ 12111 to 12117;

   - Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (religion);

   - 28 U.S.C. § 1331 (federal question jurisdiction);

   - 28 U.S.C. § 1367 (supplemental jurisdiction of closely related state claims (here, Hawaii Revised Statutes ("HRS") Chapter 378, and a state tort claim); and

   - HRS Chapter 378 (disability and religion).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1)-(2) because Defendants are domestic nonprofit corporations residing in the District of Hawaii, and a substantial part of the events giving rise to this Complaint occurred in the District of Hawaii.

## PARTIES

3. Plaintiff SUSAN F. McGINN ("Ms. McGinn") is a resident of Hawaii.

4. Defendant HAWAII SYMPHONY ORCHESTRA ("HSO") is a domestic nonprofit organization registered under the laws of the State of Hawaii.

5. Defendant MUSICIANS' ASSOCIATION OF HAWAII, LOCAL 677, AMERICAN FEDERATION OF MUSICIANS ("Local 677") is a domestic nonprofit organization registered under the laws of the State of Hawaii.

6. HSO and Local 677 are collectively herein referred to as "Defendants."

7. DOES 1-20 are individuals, partnerships, corporations and/or entities ("DOE Defendants") who are sued herein under fictitious names for the reason that their true names and/or responsibilities are presently unknown to Plaintiff except that Plaintiff is informed and believes that they are connected in some manner with Defendants and/or are responsible for all or a portion of the conduct and damages alleged herein which occurred on or about the dates and times more particularly described in this Complaint, and who are or may be necessary parties in order for the Court to grant the appropriate relief in this matter.  Plaintiff has initiated a review of the respective responsibilities relating to her Complaint, as described herein, as a diligent and good faith effort to ascertain the identity, actions, and liability of said DOE Defendants. Plaintiff will make the name or identity of the DOE Defendants known within a reasonable time after Plaintiff identifies such DOE Defendants and/or their responsibilities.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.  All conditions precedent to filing this Complaint under Title I, Title VII, and HRS

     Chapter 378 have been performed or have occurred.

## MS. MCGINN'S RIGHT TO SUE HSO

9.   Ms. McGinn timely duel filed with the Equal Employment Opportunity

     Commission ("EEOC") and with the Hawaii Civil Rights Commission

     ("HCRC") a charge against HSO alleging unlawful discrimination on the basis

     of disability, religion, and retaliation.  The EEOC Charge number is 486-2022-

     00527, and the HCRC Charge Number is FEPA No. 22119.

10. On July 13, 2023, the EEOC issued to Ms. McGinn its Notice of Right Sue HSO

     under Charge number 486-2022-00527.  Likewise, on July 18, 2023, HCRC

     issued to Ms. McGinn its Right to Sue HSO under FEPA No. 22119.

11. This Complaint is brought within 90 days of the respective EEOC and HCRC

     notices to Ms. McGinn of her right to sue HSO.

## MS. MCGINN'S RIGHT TO SUE LOCAL 677

12. Ms. McGinn timely duel filed with the EEOC and the HCRC a charge against

     Local 677 alleging unlawful discrimination on the basis of religion, disability,

     and retaliation.  The EEOC Charge number is 486-2023-00091, and the HCRC

     Charge Number is FEPA No. 22451.

13. On July 13, 2023, the EEOC issued to Ms. McGinn its Notice of Right Sue Local 677 under Charge number 486-2023-00091.  Likewise, on July 18, 2023, HCRC issued to Ms. McGinn its Right to Sue Local 677 under FEPA No. 22451.

14. This Complaint is brought within 90 days of the respective EEOC and HCRC notices to Ms. McGinn of her right to sue Local 677.

**FACTUAL ALLEGATIONS**

I.    **MS. MCGINN – PRINCIPAL FLUTIST**

15. Ms. McGinn is a loyal, tenured, and core member of HSO.

16. She is HSO's Principal Flutist and started her career with HSO in 1990.

17. Ms. McGinn is an accomplished, world-class Principal Flutist dedicated to her music and to HSO's mission.[1]

18. Like her commitment to HSO, Ms. McGinn has been a loyal and dedicated member of Local 677, where she has been an active, dues-paying member since 1990.

---

[1] HSO's Mission Statement states the following:

> To present the highest-quality performances of great music, bringing national and international distinction to the orchestra and its community; To delight and educate audiences of all ages and backgrounds, and enhance the cultural vitality and quality of life in these islands; and To operate in a financially sound manner.

*See* https://www.myhso.org/mission.

19. Ms. McGinn is Catholic.

20. Ms. McGinn suffers from a medical disability, discussed *infra*.

21. On or about August 29, 2021, Ms. McGinn signed her 2021-2022 HSO Season Contract.

## II. HSO'S COVID POLICY, THE CALL, AND HSO'S UNLAWFUL ACTIONS

22. On or about October 22, 2021, HSO imposed a new term of employment on its musicians, including Ms. McGinn:  A restrictive covid-19 vaccine mandate (the "Policy").

23. The Policy required HSO's musicians "to be fully vaccinated for COVID-19, unless they have an approved exemption."

24. According to the Policy, December 10, 2021, was the deadline to "provide either proof of full vaccination or an approved exemption request."

25. Musicians seeking an "approved exemption" from the Policy "due to a medical reason, or because of a sincerely held religious belief," were required to submit their exemption request to HSO by October 29, 2021, just five business days after HSO imposed the Policy.

26. The Policy was announced by Defendants during a Zoom video call on Friday, October 22, 2021.  This call was mandatory and all HSO musicians, including Ms. McGinn, were required to attend ("The Call").

27. The Call was conducted and led by Barbara Jaccoma on behalf of Defendants.

28. Ms. Jaccoma is attorney.[2]

29. The  alleged purpose for The Call was to allow HSO's musicians, all members of Local 677,  to "vote" on whether to approve the Policy as presented.

30. However, the musicians were told by Ms. Jaccoma that if they did not approve the restrictive Policy as presented, HSO would impose even harsher covid-related restrictions.

31. During The Call, Ms. McGinn (and other Catholics on The Call) was publicly derided as a person of faith and mocked because she is Catholic.

32. This occurred after Ms. Jaccoma, without any prompting, singled out Catholics and told the musicians during The Call that all Catholic musicians would be denied a religious accommodation from the Policy's covid shot requirement, and should not even request one, because the head of the Catholic Church, Pope Francis, approved taking the covid shots.

33. In addition to her statements being discriminatory and offensive, Ms. Jaccoma's statement  concerning  the  Pope's  purported  veto  power  over  the  requested religious accommodations of Catholics was intentionally misleading.

---

[2] Upon information and belief, Ms. Jaccoma is an attorney licensed in New York State and is not licensed in Hawaii.

34. In fact, a sincerely held religious belief cited as the basis for an accommodation from a term of employment is not legally required to be in accord with the beliefs of recognized religious leaders.

35. As an attorney advising the musicians on The Call of their legal rights, and on behalf of Defendants, Ms. Jaccoma should have known this legal fact and advised the musicians accordingly.

36. Additionally, during The Call Ms. McGinn raised legitimate medical concerns over the negative effects of repeated covid PCR testing.  But Ms. Jaccoma publicly mocked her for raising these concerns and called her "silly."

37. Ms. Jaccoma also belittled Ms. McGinn, and others on the Call, as the "unvaccinated" who should be shunned, marginalized, and isolated, and she encouraged others on The Call to express similar hostile views, which they did.

38. In fact, the true purpose of The Call was to ram through the Policy as presented, not allow any changes, and to forcefully discourage HSO's musicians, including Ms. McGinn, from seeking an accommodation to the Policy's covid shot requirement, on any basis.

39. Defendants knew in advance that The Call would take place, that Ms. Jaccoma would lead The Call on their behalf, and they were aware of the discriminatory statements she made during the Call.

40. Still, at no time during or after The Call with its discriminatory intimidation by Ms. Jaccoma did Defendants condemn, correct, or apologize for her retaliatory attacks on Ms. McGinn, or for the intentionally hostile environment Ms. Jaccoma created towards Ms. McGinn because she is Catholic and because she raised legitimate medical concerns about frequent PCR testing.

41. HSO imposed the Policy's covid shot requirement purportedly to prevent the spread of the covid virus in order "to safeguard the health of all musicians, staff, contractors and volunteers from infectious diseases such as COVID-19."

42. However, the Policy did not discuss or promote early treatment options, in lieu of the covid shots, that safely and effectively treat individuals symptomatic with, or as a prophylactic to the covid virus.

43. Nor did the Policy discuss or promote natural immunity as an effective countermeasure against illness from the covid virus.

44. It was clear even before HSO imposed the Policy that the covid shots do not prevent the spread of or illness from the covid virus.

45. As a result, the Policy itself, by requiring covid shots as the only approved covid countermeasure, was irrational, arbitrary, and capricious.

46. For example, in December 2020, a year before HSO imposed its Policy, the FDA unequivocally stated that the "data are not available to make a determination

about how long the [covid] vaccine will provide protection, *nor is their evidence that the vaccine prevents transmission of SARS-CoV-2 from person to person*."[3]

47. And in July 2021, months before HSO imposed its Policy, the US Centers for Disease Control unequivocally stated that the approved covid vaccines do not prevent the transmission of covid between individuals, and that "*vaccinated people . . . can transmit the virus.*"[4]

### III. MS. McGINN'S REQUESTED ACCOMMODATION AND HSO'S FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS.

48. Following HSO's imposition of the Policy, and with only five business days to submit her request for a medical and religious accommodation, Ms. McGinn scrambled to prepare her request.

49. In doing so, Ms. McGinn incurred significant unanticipated out-of-pocket expenses.

---

[3] *See FDA Takes Key Action in Fight Against COVID-19 By Issuing Emergency Use Authorization for First COVID-19 Vaccine;* (December 11, 2020), *at* https://www.fda.gov/news-events/press-announcements/fda-takes-key-action-fight-against-covid-19-issuing-emergency-use-authorization-first-covid-19 (last visited September 22, 2023) (emphasis added).

[4] *See Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR; (July 30, 2021), at* https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html (last visited last visited September 22, 2023) (emphasis added).

50. Despite HSO's arbitrary and hurried five-day deadline, Ms. McGinn timely filed her request for accommodation from the Policy's covid shot requirement on the basis of her medical disability and her sincerely held religious beliefs.

51. In support of her medical accommodation, Ms. McGinn provided letters from medical professionals who stated that, among other health risks, Ms. McGinn suffers from life-long severe asthma, she experienced severe adverse reactions to influenza vaccines in the past, and that taking the covid shots would create for her a serious debilitating health risk.

52. In support of her religious accommodation, Ms. McGinn provided a letter from a spiritual advisor from her faith community which confirmed that Ms. McGinn's sincerely held religious beliefs prevent her from taking the covid shots.

53. Because she was targeted on The Call as a Catholic, Ms. McGinn felt intimidated and self-censored her religious request to avoid mention of her Catholic faith.

54. Following the timely submission of her requested accommodation, HSO did not ask Ms. McGinn any questions concerning her medical condition, nor did it ask any questions about her sincerely held religious beliefs.

55. HSO also did not engage Ms. McGinn in the interactive process to discern a reasonable accommodation for ither her medical disability or her sincerely held religious belief, even after Ms. McGinn followed up with HSO for a status on her accommodation request.

56. In fact, HSO did not respond at all to Ms. McGinn's accommodation request.

57. Instead, on or about December 10, 2021, HSO shockingly informed Ms. McGinn that, regardless of the reason for her requested accommodation from the Policy and despite the Holiday season, the very next day she would be placed on indefinite unpaid leave for the 2021-2022 HSO season.

58. HSO took this unlawful adverse employment action even though Ms. McGinn was not sick, had not tested positive for covid, and was ready, willing, and able to perform pursuant to her 2021-2022 HSO Season Contract.

59. Upon information and belief, even though HSO unlawfully denied Ms. McGinn an accommodation from the Policy and refused to engage with her in the interactive process, HSO did grant an accommodation to another HSO musician on the basis of a medical disability, and to another it granted an accommodation on the basis of a sincerely held religious belief.

60. In both cases, unlike Ms. McGinn, the HSO musicians who received accommodations were not placed on indefinite unpaid leave.

61. Following HSO's unlawful adverse employment actions that placed her on indefinite unpaid leave, and after being told she was a direct threat to herself and others, Ms. McGinn experienced severe mental anguish and suffering because: She was not a direct threat to anyone; Her professional career was in jeopardy; her finances were suddenly precarious; and as discussed, *infra*, she faced

significant out-of-pocket costs and long-term living and financial obligations that she would have avoided if Defendants had been transparent with her before HSO imposed the Policy.

## IV.    IN DENYING MS. MCGINN AN ACCOMMODATION FROM THE POLICY, HSO DISCRIMINATED AGAINST HER AND VIOLATED THE POLICY TERMS.

62. HSO was obligated to manage the Policy in good faith in accordance with the Policy's terms.

63. For example, the Policy states in relevant part the following:

> Employees in need of an exemption . . . due to a medical reason, or . . . a sincerely held belief, must submit a complete Request for Exemption Form . . . by October 29, 2021.

64. This invitation to submit requests for exemptions necessarily implies that such requests will be processed in good faith and in accordance with all applicable laws.

65. But Ms. McGinn's request was not processed in good faith – it was completely ignored.

66. In addition, the Policy expressly allowed for exceptions to its masking requirement, and specifically promised testing in order for wind players, like Ms. McGinn, to perform maskless:

> The HSO recognizes exceptions to this masking requirements for individuals in performative situations . . . .   Examples for HSO are for wind and brass players or for singers and speakers when actively performing.   For those performing artists who are eligible for this exception, COVID testing will be required.

67. Furthermore, the Policy also states that individuals, like Ms. McGinn, "who have not received a response" to their request for accommodation were, in the alternative, allowed to provide a negative covid PCR test, no more than 48 hours old, in order to enter a HSO office or venue.

68. However, despite these express Policy terms, Ms. McGinn was not given the option to mask or test.

69. Instead, HSO arbitrarily and unlawfully decided that, regardless of the reasons for her requested accommodation, Ms. McGinn was a direct threat to others, barred her from performing, and placed her on indefinite unpaid leave.

70. But Ms. McGinn was not a direct threat to anyone. And she was at all times ready, willing, and able to perform.

## V. HSO's Breach of Contract and/or Custom, and its Breach of the Master Agreement to the Detriment of Ms. McGinn.

71. As Principal Flutist and a core HSO musician, Ms. McGinn was by contract and custom entitled to a right-of-first refusal to accept solo performances as HSO's Principal Flutist.

72. However, she was unlawfully denied this right by HSO in 2021 after she signed her 2021-2022 HSO Season Contract.

73. On November 12, 2021, while she was a core member of HSO, its Principal Flutist, and her 2021-2022 HSO Season Contract was in effect, and before she was placed on indefinite unpaid leave after HSO imposed the Policy, HSO

unilaterally hired another flutist to perform a solo flute part in a Brandenburg Concerto.

74. This was a direct breach of Ms. McGinn's contract and/or industry custom.[5]

75. Compounding this breach, on February 18, 2022, Ms. McGinn learned that HSO had hired another flutist to play in her stead from May 24, 2022, through July 3, 2022.

76. Again this while Ms. McGinn was still HSO's Principal Flutist and her 2021-2022 HSO Season Contract was in effect.

77. Under the terms of her season contract, she should have been playing during this time period.

78. Finally, by unlawfully discriminating against Ms. McGinn on the basis of her disability and religion, HSO breached the express terms of the Master Agreement.[6]

---

[5] *See* Final 2018-2020 HSO Master Agreement at Section 9.17(a)("Any additional work will be considered non-guaranteed extra services with specific terms as follows:  (a) First consideration for non-guaranteed extra services will be given to Core Musicians as required").

[6] *See* Section 5.10 of the Master Agreement between HSO and Local 677 ("[HSO] shall not discriminate against any Musician on the basis of . . . religion . . . or any other characteristic protected by law.").   The Master Agreement is incorporated into Ms. McGinn's 2021-2022 HSO Season Contract.

## VI.   HSO's Deceptive Conduct Before Imposing The Policy.

79. In the early summer of 2021, before she signed her HSO 2021-2022 Season Contract, Ms. McGinn inquired through proper channels, to include through the HSO Orchestra Committee ("OC"), whether HSO would adopt a mandatory covid shot requirement.[7]

80. She conveyed her concerns over the covid shots because of her medical disability and religious faith, and reasonably wanted to know her options in the event a covid shot mandate came to be.

81. During this period, a special committee of musicians ("Special Committee") formed for the very purpose of asking HSO and Local 677 about the possibility of a covid shot requirement.

82. Ms. McGinn made additional inquiries with Defendants regarding this matter in the months, weeks, and days before the Policy was suddenly announced in late October 2021.

83. With no notice that the Policy would be imposed despite asking through proper channels, and in reasonable reliance upon that information, Ms. McGinn made

---

[7] The OC consists of Local 677 Leadership who also serve as HSO musicians. Among other things, the OC's purpose is to act as liaison between the Local 677 musician members and the employer, HSO. Additionally and as addressed, *infra*, OC Leadership sits in close physical proximity to Ms. McGinn while practicing and performing for the HSO.

several vital decisions crucial to her professional, familial, and financial well-being.

84. These actions include signing her 2021-2022 HSO Season Contract, traveling to Texas for specialized medical care, declining a career advancing opportunity to teach and perform elsewhere, and committing to significant home renovations subject to substantial costs and permitting that restricted her ability to sell.

85. Ms. McGinn would not have taken these significant actions, and would not have incurred the substantial time and expenses involved, if Defendants had simply been transparent with her when she asked in early summer of 2021 whether the Policy would be imposed, and whether she would be granted an accommodation.

86. Upon information and belief, as early as the summer of 2021 -- the same period when Ms. McGinn asked about it and when the Special Committee was formed for this purpose -- Defendants were covertly planning to impose the Policy on HSO's musicians.

87. Defendants kept this information secret and did not share it with Ms. McGinn, or with the Special Committee, despite their collective inquiries during this period, and before the Policy was suddenly imposed on HSO's musicians in late October 2021.

## VII.  DEFENDANTS' UNLAWFUL RETALIATORY CONDUCT AGAINST MS. MCGINN.

88. Before and after she requested an accommodation from the Policy, Ms. McGinn was subject to retaliation by Defendants.

89. This includes the discriminatory treatment she received on The Call; HSO's retaliatory use of covid testing by requiring Ms. McGinn, but not other musicians, to test before Hawaii Opera Theater performances; HSO's retaliatory use of rotations to deny Ms. McGinn hers in favor of a junior HSO member who, unlike Ms. McGinn, was not a core HSO musician member and was not entitled to a rotation under the circumstances; and by the retaliatory use of HSO's tardiness rules to unfairly single out Ms. McGinn for being late to a rehearsal following a minor traffic accident while not imposing similar punishment for other HSO musicians who violated the tardy policy.

90. In violation of its obligation to her and even though she repeatedly asked for help, Local 677 refused to assist Ms. McGinn with her requested accommodation and also failed to assist her after HSO placed her on indefinite unpaid leave.

91. Finally, musician members of the OC, and specifically its Leadership, sit in close proximity to Ms. McGinn during HSO practices and performances.

92. After she was allowed to return to perform with HSO in the summer of 2022, these OC members, including Local 677 Leadership, were openly hostile to Ms.

McGinn and intentionally fostered around her a hostile, cold, and inimical work environment.

93. The retaliatory hostile treatment directed at Ms. McGinn during this period, and throughout the 2022-2023 HSO season, did not occur prior to when she requested an accommodation from the Policy in November 2021, or prior to when she filed her Charge of discrimination with the EEOC in March 2022.

94. In fact, this retaliatory treatment towards Ms. McGinn occurred only after and as a direct result of her requested accommodation from the Policy, and having being treated unlawfully after its submission, directly as a result of the duel Charge she filed with EEOC and HCRC.

## CLAIMS FOR RELIEF

### Count I
**Against Defendant HSO**
**Violation of Title I**
**(Disparate Treatment/Failure to Accommodate on the Basis of Disability)**

95. The foregoing Paragraphs are incorporated herein.

96. Title I forbids an employer from discriminating against an employee because the employee requests an accommodation from a term of employment due to a medical disability, absent proof that granting the accommodation would cause the employer an undue hardship.

97. HSO violated Title I when it unlawfully discriminated against Ms. McGinn because of her medical disability.

98. First, before placing Ms. McGinn on indefinite unpaid leave, HSO did not inquire about her medical disability, it did not initiate or engage in the interactive process, and it made no effort to accommodate her medical disability.

99. Instead and based upon an unsupported conclusory assertion that Ms. McGinn was a "threat to others," it denied her requested accommodation from the Policy based on her disability because, HSO claimed, granting her an accommodation would create for it an "undue hardship."

100. As a result, HSO waived its right to challenge Ms. McGinn's disability to qualify for an accommodation from the Policy.

101. But even if Ms. McGinn for purposes of this Complaint must establish a *prima facie* case of disability discrimination under Title I, she can.

102. Ms. McGinn satisfies her *prima facie* burden under Title I: She is disabled as defined under Title I due to her life-long severe allergic reactions to influenza vaccines, among other related health risks; she timely informed HSO of her disability and need for accommodation from the Policy; she is unquestionably qualified to hold the job of Principal Flutist given her successful and years-long tenure in that role prior to HSO's decision to impose the Policy; and she suffered an adverse employment action because of her disability when, instead of

accommodating her as it should have, HSO placed her on indefinite unpaid leave.[8]

103.   In fact, accommodating Ms. McGinn for her medical disability would not have imposed an undue hardship on HSO.

104.   Moreover, the Policy itself specifically allows for accommodations for musicians who play wind instruments and who are not "fully vaccinated," like Ms. McGinn, to mask and test in lieu of the covid shot.

105.   Finally, upon information and belief, HSO granted at least one accommodation from the Policy, based on a medical disability, to another HSO musician who, unlike Ms. McGinn, was allowed to perform and was not placed on indefinite unpaid leave.

106.   HSO violated Title I because it unlawfully disregarded Ms. McGinn's medical disability; it did not engage in the interactive process to find an accommodation to her medical disability; it did not follow the Policy terms that expressly allow for accommodations to the Policy's covid shot requirement; it took an adverse employment action against Ms. McGinn by placing her on indefinite unpaid leave; and it denied her the very same accommodation that it granted to another, similarly situated HSO musician.

---

[8] *See Lee v. L3Harris Techs.*, 2023 U.S. App. LEXIS 21704, 2 (9th Cir. 2023)(elements of *prima facie* disability discrimination case under Title I).

107.    As a result of HSO's unlawful disability discrimination in violation of Title I,

Ms. McGinn suffered economic and non-economic damages in amounts to be

proven at trial.

**Count II**
**Against Defendant HSO**
**Violation of HRS Chapter 378**
**(Disparate Treatment/Failure to Accommodate on the Basis of Disability)**

108.    The allegations set forth in Count I are incorporated herein, with the exception

that Tile I is replaced with HRS Chapter 378.[9]

109.    As a result of HSO's unlawful disability discrimination in violation of HRS

Chapter 378, Ms. McGinn suffered economic and non-economic damages in

amounts to be proven at trial.

**Count III**
**Against Defendant HSO**
**Violation of Title VII**
**(Disparate Treatment/Failure to Accommodate on the Basis of Religion)**

110.    The allegations set forth in the above Paragraphs 1 to 94 are incorporated

herein.

111.    Title VII forbids an employer from refusing employment to someone because

of her need for religious accommodation from a term of employment, absent

---

[9]*See French v. Haw. Pizza Hut, Inc.,* 105 Haw. 462, 476-468 (2004) (citing the Title I for guidance)(elements of *prima facie* disability discrimination case under HRS Chapter 378).

proof that granting the accommodation would cause the employer an undue hardship.[10]

112. First, before placing Ms. McGinn on indefinite unpaid leave, HSO did not inquire about her sincerely held religious beliefs, it did not initiate or engage in the interactive process, and it made no effort to accommodate her beliefs.

113. Instead and based upon an unsupported conclusory assertion that Ms. McGinn was a "threat to others," it denied her requested accommodation from the Policy based on her sincerely held religious beliefs because, HSO claimed, granting her an accommodation would create for it an "undue hardship."

114. As a result, HSO waived its right to challenge Ms. McGinn's sincerely held religious beliefs to qualify for an accommodation from the Policy.

115. But even if Ms. McGinn for purposes of this Complaint must establish a *prima facie* case of religious discrimination under Title VII, she can.

116. Ms. McGinn satisfies all three elements of her *prima facie* case of religious discrimination against HSO because she timely informed HSO of her bona fide sincerely held religious beliefs when she requested a religious accommodation from the Policy's covid shot requirement; She demonstrated that her sincerely held religious beliefs conflicted with the Policy; and She suffered an adverse

---

[10] *See* 42 U.S.C. §§ 2000e(j), 2000e-2(a)(1); *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015).

employment action when HSO unlawfully placed her on indefinite unpaid leave.[11]

117.  And other than conclusory, self-serving statements, HSO has not identified any hardship, let alone any undue hardship, that excuses its adverse employment action against Ms. McGinn.

118.  In fact, accommodating Ms. McGinn would not have imposed an undue hardship on HSO.

119.  Indeed, the Policy itself specifically allows for accommodations for musicians who play wind instruments and who are not "fully vaccinated," like Ms. McGinn, to mask and test in lieu of vaccination.

120.  Finally, upon information and belief, HSO granted at least one accommodation from the Policy, based on a sincerely held religious belief, to another HSO musician who, unlike Ms. McGinn, was not placed on indefinite unpaid leave.

121.  HSO's unlawful disregard of Ms. McGinn's request for religious accommodation and its unlawful adverse employment actions against her violated Title VII.

---

[11] *See Burns v. Southern Pacific Transp. Co.*, 589 F.2d 403, 405 (9th Cir. 1978) (elements of *prima facie* religious discrimination case under Title VII).

122.   As a result, Ms. McGinn suffered economic and non-economic damages in amounts to be proven at trial.

**Count IV**
**Against Defendant HSO**
**Violation of HRS Chapter 378**
**(Disparate Treatment/Failure to Accommodate on the Basis of Religion)**

123.   The allegations set forth in Count III are incorporated herein, with the exception that Tile VII is replaced with HRS Chapter 378.[12]

124.   As a result, Ms. McGinn suffered economic and non-economic damages in amounts to be proven at trial.

**Count V**
**Against Defendant HSO**
**Violation of Title I**
**(Retaliation)**

125.   The allegations set forth in the above Paragraphs 1 to 94 are incorporated herein.

---

[12]*See* HRS § 378-2(a)(1)("It shall be an unlawful discriminatory practice: (1) Because of . . . religion . . . (A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment[.]"; *see also* 42 U.S.C. § 2000e(j); *Sam Teague, Ltd. v. Hawai'i Civil Rights Comm'n,* 89 Haw. 269, 281 (1999) ("Accordingly, the federal courts' interpretation of Title VII is useful in construing Hawai'i's employment discrimination law. *See Furukawa*, 85 Haw. at 13, 936 P.2d at 649 (adopting the framework used by federal courts in resolving question of discrimination under HRS ch. 378)"). (citation in original)(elements of *prima facie* religious discrimination case under HRS Chapter 378).
.

126.   Title I forbids an employer from retaliating against an employee who requests an accommodation based on a medical disability, or who files a complaint because an accommodation was denied.

127.   Ms. McGinn satisfies all three elements of her *prima facie* case of Title I retaliation inflicted by HSO because:  1) She faced discriminatory and hostile animus during The Call because she has a medical disability and after raising her legitimate concerns about frequent PCR testing; 2) She engaged in the protected activity of requesting an accommodation from the Policy based on her medical disability; 3) She engaged in the protected activity of filing her duel Charge of disability discrimination with the EEOC and HCRC after her request was denied; 4) She was placed on indefinite unpaid leave without any interactive process after submitting her request, and based merely on a conclusory assertion that she was a threat to others when she as not; and 4) There is a causal link between HSO's retaliatory and adverse employment actions against Ms. McGinn. [13]

128.   Moreover, the retaliatory treatment continued for an extended period, and included HSO's retaliatory use of covid testing, rotations, and its tardiness rules, and the hostile work environment which HSO allowed to exist against Ms. McGinn.

---

[13] *See Pardi v. Kaiser Permanente Hosp., Inc.,* 389 F.3d 840, 849 (9th Cir. 2004)(citation omitted)(elements of *prima facie* retaliation case under Title I).

129.   As a result, Ms. McGinn suffered economic and non-economic damages in amounts to be proven at trial.

**Count VI**
**Against Defendant HSO**
**Violation of Title VII**
**(Retaliation)**

130.   The allegations set forth in Count V are incorporated herein, with the exception that Title I is replaced with Title VII.[14]

131.   As a result, Ms. McGinn suffered economic and non-economic damages in amounts to be proven at trial.

**Count VII**
**Against Defendant HSO**
**Violation of HRS Chapter 378**
**(Retaliation)**

132.   The allegations set forth in Count VI are incorporated herein, with the exception that Title VII is replaced with HRS Chapter 378.[15]

133.   As a result, Ms. McGinn suffered economic and non-economic damages in amounts to be proven at trial.

---

[14]*See Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004) (elements of prima facie case of relation under Title VII).

[15]*See Schefke v. Reliable Collection Agency, Ltd.*, 96 Haw. 408, 426 (2001)(elements of *prima facie* case of retaliation under HRS Chapter 378).

## Count VIII
### Against Local 677
### Violation of HRS Section 378
### (Aiding & Abetting)

134.   The foregoing Paragraphs are incorporated herein.

135.   Local 677 violated HRS Chapter 378 because it aided and abetted HSO's unlawful discrimination and adverse employment actions against Ms. McGinn. [16]

136.   Local 677 did this by, among other things,  colluding with  HSO during the summer of 2021 to formulate and impose the Policy, and failed to disclose this information to Ms. McGinn when during that time period she asked Defendants whether covid shots would be required.

137.   Local 677 pre-planned and/or coordinated The Call with HSO where its representative, Ms. Jaccoma, publicly shamed, bullied, and discriminated against Ms. McGinn on the basis of her medical disability and  religion.

138.   Defendants knew before the Call that Ms. Jaccoma would behave in this unacceptable manner.

139.   Moreover, after The Call, Defendants did not condemn Ms. Jaccoma for her unacceptable discriminatory remarks, nor did they apologize to Ms. McGinn for them.

---

[16] *See* HRS Section 378-2.3.

140.   In fact, Ms. Jaccoma's role and demeanor on The Call was a vital part of Defendants' effort to coerce compliance from HSO's musicians with the Policy's covid shot requirement.

141.   This coercive plan was especially important to discourage legitimate accommodations from the Policy.

142.   As further evidence of its aiding and abetting HSO's unlawful discriminatory and retaliatory acts against Ms. McGinn, and even though Local 677 is obligated to do so, it failed to represent or assist Ms. McGinn secure her requested accommodations from the Policy, and it did not help her get her job back when HSO placed her on indefinite unpaid leave.

143.   This even though Ms. McGinn repeatedly requested assistance from Local 677 for help with these issues.

144.   Moreover, Local 677 Leadership, through the OC, shunned Ms. McGinn and created for her a hostile work environment, one that did not exists before The Call, or before she requested an accommodation from the Policy, or before she filed her Charge of discrimination.

145.   Ms. McGinn was significantly damaged as a result of Local 677's unlawful aiding and abetting in violation of HRS Chapter 378 in amounts to be proven at trial.

## Count IX
### Against Defendants
### (Punitive Damages)

146.   The foregoing Paragraphs are incorporated herein.

147.   Clear and convincing evidence of Defendants' wanton conduct is manifest and includes the following: [17]

148.   Defendants intentionally collaborated to discriminate against Ms. McGinn based on her sincerely held religious beliefs, and on the basis of her medical disability;

149.   Months before HSO imposed its Policy and knowing that they would impose it, Defendants refused to acknowledge its likelihood to Ms. McGinn, or to the Special Committee, even though, in order to plan her career and address critical health concerns of which she informed Defendants, she and they asked Defendants during this time period whether HSO would require covid shots;

150.   Defendants used The Call as a tool of discrimination to intimidate Ms. McGinn into compliance with the Policy;

151.   The Call was conducted on Defendants' behalf, they knew what was said on The Call, and the discrimination and hostility that was expressed towards

---

[17] *See* Hawaii Jury Instructions No. 8.12 (elements of punitive damages).

Catholics, and especially Catholics like Ms. McGinn who opted to remain "unvaccinated;"

152.  Defendants did not condemn what was said on The Call on their behalf, nor did they apologize for it, and therefore affirmatively assented to its discriminatory message;

153.  During The Call, Defendants intentionally mislead Ms. McGinn, and other Catholics on The Call, by advising her that requests for religious accommodation from the Policy's covid shot requirement would automatically be deemed invalid because the Pope approved taking the covid shots;

154.  HSO intentionally ignored its obligation to engage Ms. McGinn in a good faith interactive process after she submitted her requests for accommodation;

155.  HSO intentionally denied to Ms. McGinn the Policy terms which expressly provide masking and testing as accommodations from the Policy's covid shot requirement;

156.  HSO intentionally breached the terms of Ms. McGinn's 2021-2022 Season Contract by hiring another flutist in her stead for a solo performance, and by refusing to allow Ms. McGinn to perform with the orchestra during the 2021-2022 season, even though she had a right of first refusal and she was at all relevant times ready, willing, and able to perform;

157.   HSO intentionally and unlawfully imposed adverse employment actions on Ms. McGinn by denying her an accommodation from the Policy, and by placing her on indefinite unpaid leave;

158.   Defendants, through their representative Ms. Jaccoma, intentionally discriminated against Ms. McGinn because of her medical disability and because of her sincerely held religious beliefs as a Catholic;

159.   Defendants, through their representative Ms. Jaccoma, intentionally publicly ridiculed and marginalized Ms. McGinn because she had not taken the covid shot, and encouraged others to do likewise, which they did;

160.   Local 677 intentionally failed to represent or assist Ms. McGinn with her request for accommodation, and intentionally did not assist or represent her after HSO placed her on indefinite unpaid leave – even though Local 677 is obligated to represent Ms. McGinn in such matters; and

161.   Defendants retaliated against Ms. McGinn because she engaged in protected activities by creating for her a hostile work environment that did not exist before The Call, or before she requested an accommodation from the Policy, or before she filed her Charge.

162.   Defendants forcefully coerced Ms. McGinn to abandon her protected rights and beliefs, and to instead violate those rights and beliefs -- and severely harm her health -- and to take the covid shot.

163. Ms. McGinn has been able to withstand these intentional, wanton, and coercive efforts, but she has paid a steep price, professionally, financially, mentally, and emotionally, in order to remain true to her beliefs, and to protect her health and her rights.

164. Defendants should therefore be sanctioned as a warning to other organizations not to behave in such harmful, anti-social ways against their employees and members.

165. As a result, Ms. McGinn should be awarded punitive damages in amounts to be proven at trial.

## REQUEST FOR RELIEF

166. Ms. McGinn prays that the Court grant the following relief:

    a. Award her all appropriate and legally available monetary relief, including lost compensation and benefits, damages for pain and suffering, and punitive damages in amounts to be determined at trial, to make her whole for the damages she has suffered as a result of Defendants' unlawful conduct as alleged in this Complaint, and to sanction Defendants for their punitive conduct;

    b. Award her interest at the legal rate on such damages as appropriate, including pre- and post-judgment interest;

c.  Award her a reasonable amount of attorneys' fees for the work of her attorneys in pursuit of this action and the protection of her rights;

d.  Award her all costs, disbursements, and expenses that were paid or incurred on her behalf in pursuit of her claims as set forth in this Complaint;

e.  Award any other relief as allowed by law;

f.  Retain jurisdiction to enforce this Court's judgments; and

g.  Award such additional relief the Court deems just and proper.

DATED: Honolulu, Hawaii, October 10, 2023.

/s/*Joseph A. Gomes*
JOSEPH A. GOMES

Attorney for Plaintiff
SUSAN F. McGINN