IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SUSAN F. McGINN,<br><br>        Plaintiff,<br><br>    v.<br><br>HAWAII SYMPHONY ORCHESTRA;<br>MUSICIANS' ASSOCIATION OF<br>HAWAII, LOCAL 677, AMERICAN<br>FEDERATION OF MUSICIANS; AND<br>DOES 1–20,<br><br><br>        Defendants. | CIV. NO. 23-00415 JMS-RT<br><br>ORDER GRANTING IN PART<br>WITH LEAVE TO AMEND, AND<br>DENYING IN PART<br>(1) DEFENDANT MUSICIANS'<br>ASSOCIATION OF HAWAII,<br>LOCAL 677, AMERICAN<br>FEDERATION OF MUSICIAN'S<br>MOTION TO DISMISS, ECF NO.<br>20; AND (2) DEFENDANT<br>HAWAII SYMPHONY<br>ORCHESTRA'S MOTION TO<br>DISMISS, ECF NO. 22 |

**ORDER GRANTING IN PART WITH LEAVE TO AMEND, AND
DENYING IN PART (1) DEFENDANT MUSICIANS' ASSOCIATION OF
HAWAII, LOCAL 677, AMERICAN FEDERATION OF MUSICIAN'S
MOTION TO DISMISS, ECF NO. 20; AND (2) DEFENDANT HAWAII
SYMPHONY ORCHESTRA'S MOTION TO DISMISS, ECF NO. 22**

## I.  INTRODUCTION

This Order rules on two Motions in this lawsuit brought by Plaintiff

Susan F. McGinn ("Plaintiff" or "McGinn") against Defendant Hawaii Symphony

Orchestra ("the HSO") and Defendant Musicians' Association of Hawaii, Local

677, American Federation of Musicians ("Local 677" or "the Union") (collectively

"Defendants").  McGinn alleges religious and disability discrimination in violation

of federal and Hawaii law based on the HSO's placement of her on indefinite unpaid leave after she refused to vaccinate against the SARS-CoV-2 virus in 2021, and after requesting an exemption.  *See* ECF No. 1.

First, the Union moves to dismiss, arguing that Plaintiff's state law aiding and abetting claim is preempted under Section 9(a) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 159(a).  As a disguised breach of duty of fair representation claim, the Union contends that the claim is barred by a six-month statute of limitations.  *See* ECF No. 20 at PageID.93.  Second, the HSO moves to dismiss, arguing that the discrimination and retaliation claims fail because, among other grounds, accommodating McGinn's exemption request constituted an "undue hardship."  *See* ECF No. 22 at PageID.229–33.  Both Motions also argue that McGinn's separate claim for punitive damages should be dismissed as a stand-alone cause of action.  *See* ECF No. 20 at PageID.105; ECF No. 22 at PageID.238.[1]

Based on the following, the Motions to Dismiss are GRANTED without prejudice in part and DENIED in part.  McGinn is given leave to file an

---

[1]  The HSO originally also argued that this action was improper because Plaintiff was required to file a grievance with an arbitrator for any disputes, and because she did not do so, the court lacks jurisdiction.  *See* ECF No. 22 at PageID.222–26.  The HSO, however, withdrew that argument in its Reply.  *See* ECF No. 30 at PageID.524.

Amended Complaint to attempt to satisfy deficiencies identified in this Order. She has until **April 19, 2024**, to file an Amended Complaint.

## II. <u>BACKGROUND</u>

### A.    Factual Background

#### 1.    *The 2021 COVID-19 Vaccine Mandate*

The court assumes the following relevant allegations of the Complaint are true for purposes of this Motion to Dismiss. *See, e.g.*, *Steinle v. City & Cnty. of S.F.*, 919 F.3d 1154, 1158 n.1 (9th Cir. 2019).[2]

McGinn "is a loyal, tenured, and core member of HSO," and "is an accomplished, world-class Principal Flutist" who "has been an active, dues-paying member [of Local 677] since 1990." ECF No. 1 at PageID.5.[3] She is Catholic. *Id.* at PageID.6. She also "suffers from a medical disability," *id.*, described as "life-long severe asthma [and having] experienced severe adverse reactions to influenza vaccines in the past." *Id.* at PageID.11. "On or about August 29, 2021, McGinn signed her 2021−2022 Season Contract." *Id.* at PageID.6. All musicians

---

[2] For some of the background and legal principles, the court draws directly from *Gallagher v. Honolulu Symphony Orchestra*, 2024 WL 1331799 (D. Haw. Mar. 27, 2024), which is an Order on a similar motion in another case assigned to this court regarding an HSO musician and the HSO's COVID-19 vaccination protocols. *Gallagher* was argued together with this case, although some of the results differ based on differences in certain allegations.

[3] A flute is a "wind instrument in which the sound is produced by a stream of air directed against a sharp edge, upon which the air breaks up into eddies that alternate regularly above and below the edge, setting into vibration the air enclosed in the flute." *Flute*, Britannica, http://britannica.com/art/flute-musical-instrument [https://perma.cc/Z9QL-7FCS)].

employed by the HSO are members of Local 677.  *Id.* at PageID.7; ECF No. 22-5 at PageID.332.[4]

On or about October 22, 2021, the HSO "imposed a new term of employment on its musicians, including Ms. McGinn."  *Id.* at PageID.6.  The "new term" was a COVID-19 vaccine mandate, requiring HSO musicians "to be fully vaccinated for COVID-19, unless they have an approved exemption."  *Id.* This vaccine mandate was negotiated between the HSO and Local 677 in light of the worldwide COVID-19 pandemic that began in 2020.  The mandate was announced on October 22, 2021, and it became effective on October 25, 2021.  *Id.*; ECF No. 22-2 at PageID.247; ECF No. 22-7 at PageID.380.  The court refers to the HSO's vaccine mandate, which is essentially an addendum to the CBA, as the CBA's "COVID-19 Protocols" or "the Protocols."[5]  In relevant part the Protocols provided as follows:

**Mandatory Vaccination:**

All HSO musicians, staff, contractors, and volunteers are required to be fully vaccinated for COVID-19, unless they have an approved exemption.  "Fully vaccinated" means at least two weeks have passed since receiving the second shot in a two-shot series or the single shot in a one-shot series of a vaccine for COVID-19, which has

---

[4]  As discussed later, the court incorporates by reference into the Complaint the 2018–2020 Master Agreement between the HSO and Local 677, and related documents (collectively "the Collective Bargaining Agreement" or "the CBA").  *See* ECF Nos. 22-2, 22-5 and 22-6.

[5]  Also as discussed later, the court incorporates the Protocols into the Complaint by reference.  *See* ECF No. 22-7.

been authorized by the U.S. Food and Drug Administration (FDA).

The HSO is providing a grace period to allow individuals time to be fully vaccinated.  By December 10, 2021, all individuals must provide either proof of full vaccination or an approved exemption request.  Employees in need of an exemption from this policy due to a medical reason, or because of a sincerely held religious belief, must submit a completed Request for Exemption Form to the Personnel Manager (PM) by October 29, 2021.

. . . .

After December 10, 2021, any individual who has chosen not to be fully vaccinated or has not been approved for an exemption will be placed on leave without pay status but will retain their medical and instrument insurance through July 3, 2022.  They may be permitted to return to work once these protocols are lifted, or they are in compliance with the protocols on a rolling basis; January 10, 2022, February 22, 2022, or May 16, 2022.

. . . .

**Exemptions:**

Individuals who have received an exemption or who have not yet received a response from a timely application must provide a negative PCR COVID-19 test date stamped no longer than 48 hours before each entry at the HSO Office, Hawaii Theatre Center, Blaisdell Concert Hall, or all other venues the HSO is utilizing in an official capacity.  See the testing provision below.  If an individual with an exemption who can play their instrument while wearing a face mask, refuses to be tested, they will be placed on leave without pay status but will retain their medical and instrument insurance through July 3, 2022.  They may be permitted to return to work once these protocols are lifted, or they are in

compliance with the protocols on a rolling basis; January 10, 2022, February 22, 2022, or May 16, 2022.

Individuals with an exemption that must remove their face mask in order to perform will not be able to utilize two levels of mitigation. This is considered a direct threat to the health and safety of the individual and others. Therefore, they will be placed on leave without pay status, but will retain their medical and instrument insurance through July 3, 2022. They may be permitted to return to work once these protocols are lifted, or they are in compliance with the protocols on a rolling basis; January 10, 2022, February 22, 2022, or May 16, 2022.

**Face Masks:**

Currently, per federal regulations and recent orders from the State of Hawaii, all individuals are required to wear a face mask while indoors, regardless of their vaccination status. The HSO recognizes exceptions to this masking requirement for individuals in performative situations or while on camera being filmed. Examples for HSO are for wind and brass players or for singers and speakers when actively performing. For those performing artists who are eligible for this exception, COVID testing will be required. Information regarding COVID testing will be sent out in the week prior to affected services.

Face masks should be well-fitting, not transparent, have two or more layers, completely cover your mouth and nose, and fit snugly against the sides of your face with no gaps. Face masks with vents are not approved. Black medical masks will be available to anyone who requests them for performance services. If someone forgets their mask or needs a compliant mask for other rehearsals, they should let management know.

ECF No. 22-7 at PageID.380–81.

Under the face mask provisions, all musicians were required to wear face masks even if they were fully vaccinated.  But even fully vaccinated musicians "in performative situations" such as "wind and brass players or . . . singers and speakers when actively performing"—because they could not wear a mask in those situations—would also be required to comply with testing protocols. *See id.* at PageID.381.

And under the exemption provisions, even if a musician received an exemption from vaccination (or had applied for an exemption but was awaiting an answer), that musician—if they could perform with a face mask—would *also* be required to test for COVID-19 periodically and receive a negative test result before being allowed to enter HSO venues.  *See id.* at PageID.380–81.  Moreover, even if a musician had received an exemption but "must remove their face mask in order to perform," that musician would "not be able to utilize two levels of mitigation," i.e., masking and testing.  *See id.* at PageID.381.  Such musicians (such as "wind and brass players or . . . singers and speakers when actively performing" who could not perform with a face mask) would be "considered a direct threat to the health and safety of the individual and others," and would thus be placed on indefinite leave without pay so long as they were not fully vaccinated (and *regardless* of receiving the exemption).  *See id.* at PageID.380–81.  Effectively, then, musicians

who could not perform with a face mask had no real option—get vaccinated or be placed on leave without pay.

When the CBA's COVID-19 Protocols were negotiated, the Mayor of the City and County of Honolulu had declared a state of emergency pursuant to Hawaii law, and enacted a Proclamation and Emergency Order No. 2021-14 (and subsequent extensions) (the "Mayor's Proclamation"), of which the court takes judicial notice, as explained later.  *See* ECF No. 22-4.  Included within the Mayor's Proclamation was "Order 10, Safe Access Oahu," which provided as follows:

A.    All covered entities shall not permit a patron to enter covered premises without displaying proof of full vaccination, and identification bearing the same identifying information as the proof of full vaccination.  Furthermore, all covered entities shall not permit a full or part-time employee, intern, volunteer, or contractor to enter covered premises without proof of full vaccination.

B.    Exceptions: The following individuals are exempt from this Order 10, section A above, and therefore may enter covered premises without proof of full vaccination, unless otherwise indicated in this Proclamation and Order:

1.    Patrons with proof of a negative COVID-19 test result taken within 48 hours of entry into the covered premises, and identification bearing the same identifying information as the proof of negative COVID-19 test presented (the negative test result required under this section B must be from an FDA

8

approved, or FDA EUA approved, molecular or antigen test);

2.    Full or part-time employees, interns, volunteers, or contractors with proof of a negative COVID-19 test result taken within seven (7) days of entry into the covered premises (the negative test result required under this section B must be from an FDA approved, or FDA EUA approved, molecular or antigen test);

3.    Individuals under 12 years of age; or

4.    Individuals entering and remaining for 15 minutes or less per 24-hour day . . . .

ECF No. 22-4 at PageID.289–90.  The Mayor's Proclamation did not include specific religious or disability exceptions.  And Order 12 provided for penalties for violations of any of the Mayor's Proclamation's orders, to be enforced by law enforcement personnel of the State of Hawaii and City & County of Honolulu.  *Id.* at PageID.292–93.

## 2.    *The October 2021 Imposition of the CBA's COVID-19 Protocols and McGinn's Request for an Exemption*

The Complaint describes certain events that happened during a Zoom call on October 22, 2021 ("the Call"), conducted and led by Union attorney Barbara Jaccoma "on behalf of Defendants."  ECF No. 1 at PageID.6.[6]  During the

---

[6]  The Complaint does not allege that Jaccoma is an employee of the Union, but does allege that "[u]pon information and belief, Ms. Jaccoma is an attorney licensed in New York State and is not licensed in Hawaii."  ECF No. 1 at PageID.7 n.2.

Call, HSO musicians were told the details of the CBA's COVID-19 Protocols and were asked to vote on them.  *Id.* at PageID.7.  The Complaint alleges that during the Call, "Ms. McGinn (and other Catholics on [t]he Call) was publicly derided as a person of faith and mocked because she is Catholic." *Id.*  It alleges that during the Call,

> Ms. Jaccoma, without any prompting, singled out Catholics and told the musicians during [t]he Call that all Catholic musicians would be denied a religious accommodation from the Policy's covid shot requirement, and should not even request one, because the head of the Catholic Church, Pope Francis, approved taking the covid shots.

*Id.*

> Additionally, during [t]he Call[,] Ms. McGinn raised legitimate medical concerns over the negative effects of repeated covid PCR testing.  But Ms. Jaccoma publicly mocked her for raising these concerns and called her "silly."

*Id.* at PageID.8.

> Ms. Jaccoma also belittled Ms. McGinn, and others on the Call, as the "unvaccinated" who should be shunned, marginalized, and isolated, and she encouraged others on [t]he Call to express similar hostile views, which they did.

*Id.*

The Complaint further alleges that "Defendants knew in advance that [t]he Call would take place, that Ms. Jaccoma would lead [t]he Call on their behalf,

and they were aware of the discriminatory statements she made during the Call," but did not "condemn, correct, or apologize for [her actions]."  *Id.* at PageID.8–9. And it also includes several paragraphs describing purported shortcomings of the Protocols, stating that they were "irrational, arbitrary, and capricious."  *Id.* at PageID.9.

Ultimately, however, the Complaint does not challenge the CBA's COVID-19 Protocols facially.  Rather, the Complaint alleges causes of action (Count I and II) against the HSO under Title I of the Americans with Disabilities Act ("ADA") and Hawaii Revised Statutes ("HRS") Chapter 378 for disparate treatment and failure to accommodate based on disability.  *Id.* at PageID.19–22. Similarly, in Counts III and IV, it alleges disparate treatment and failure to accommodate against the HSO based on religion under Title VII and HRS Chapter 378.  *Id.* at PageID.22–25.  Counts V, VI, and VII allege unlawful retaliation by the HSO under the ADA, Title VII, and HRS Chapter 378.  *Id.* at PageID.25–27. Count VIII alleges a violation of HRS Chapter 378 against the Union for "aiding and abetting" the HSO's discrimination and retaliation.  *Id.* at PageID.28–29. Finally, Count IX alleges a stand-alone claim for punitive damages against both Defendants, describing allegations of willful and intentional discrimination.  *Id.* at PageID.30–31.

The causes of action are based on allegations that McGinn sought a timely religious- and disability-based exemption under the terms of the Protocols, but the HSO ignored the request and, instead, placed her on indefinite unpaid leave after she failed to submit proof of an approved COVID-19 vaccination.  *Id.* at PageID.10–13.  It alleges that, in support of her request for a disability exemption, McGinn:

> provided letters from medical professionals who stated that, among other health risks, Ms. McGinn suffers from life-long severe asthma, she experienced severe adverse reactions to influenza vaccines in the past, and that taking the covid shots would create for her a serious debilitating health risk.

*Id.* at PageID.11.  And in support of an exemption based on religion, it alleges that she "provided a letter from a spiritual advisor from her faith community which confirmed that Ms. McGinn's sincerely held religious beliefs prevent her from taking the covid shots."  *Id.*

According to the Complaint, "[f]ollowing the timely submission of her requested accommodation, [the] HSO did not ask Ms. McGinn any questions concerning her medical condition, nor did it ask any questions about her sincerely held religious beliefs," *id.*, nor did the HSO "engage Ms. McGinn in the interactive process to discern a reasonable accommodation for [either] her medical disability or her sincerely held religious belief, even after Ms. McGinn followed up with [the] HSO for a status on her accommodation request."  *Id.*

12

Allegedly, the HSO did not respond to the request for an exemption—effectively denying it. *Id.* at PageID.12. "[O]n or about December 10, 2021," the HSO "informed Ms. McGinn that, regardless of the reason for her requested accommodation from the Policy and despite the Holiday season, the very next day she would be placed on indefinite unpaid leave for the 2021-2022 HSO season." *Id.* The Complaint also alleges, on information and belief, that the HSO—although it did not accommodate McGinn or engage her in an interactive process—granted an accommodation to another HSO musician based on medical disability and to a musician on the basis of a sincerely held religious belief, without placement on indefinite unpaid leave. *Id.* (It does not explain what instrument those musicians played, i.e., whether they could play with a mask.)

The Complaint also alleges that the HSO did not give McGinn the opportunity to comply with alternate testing provisions in the Protocols. *Id.* at PageID.14. Specifically, it alleges that "the Policy expressly states that individuals, like Ms. McGinn, 'who have not received a response' to their request for accommodation were, in the alternative, allowed to provide a negative covid PCR test, no more than 48 hours old, in order to enter a HSO office or venue," and "despite this express term, Ms. McGinn was not given the option to mask or test." *Id.* "Instead, [the] HSO arbitrarily and unlawfully decided that, regardless of the

reasons for her requested accommodation, Ms. McGinn was a direct threat to

others, barred her from performing, and placed her on indefinite unpaid leave." *Id.*

### 3.   *Allegations of Retaliatory Conduct*

As for retaliation, the Complaint alleges that both "[b]efore and after

she requested an accommodation from the Policy [in October 2021], Ms. McGinn

was subject to retaliation by Defendants," including

> the discriminatory treatment she received on [t]he Call;
> HSO's retaliatory use of covid testing by requiring Ms.
> McGinn, but not other musicians, to test before Hawaii
> Opera Theater performances; HSO's retaliatory use of
> rotations to deny Ms. McGinn hers in favor of a junior
> HSO member who, unlike Ms. McGinn, was not a core
> HSO musician member and was not entitled to a rotation
> under the circumstances; and by the retaliatory use of
> HSO's tardiness rules to unfairly single out Ms. McGinn
> for being late to a rehearsal following a minor traffic
> accident while not imposing similar punishment for other
> HSO musicians who violated the tardy policy.

*Id.* at PageID.18.

McGinn further alleges that "[a]fter she was allowed to return to

perform with [the] HSO in the summer of 2022, [Orchestra Committee] members,

including Local 677 Leadership, were openly hostile to Ms. McGinn and

intentionally fostered around her a hostile, cold, and inimical work environment."

*Id.* at PageID.18–19.  "[T]his retaliatory treatment towards Ms. McGinn occurred

only after and as a direct result of her requested accommodation from the Policy,

and having being (sic) treated unlawfully after its submission, directly as a result of

14

the duel Charge she filed with [the Equal Employment Opportunity Commission ("EEOC")] and [the Hawaii Civil Rights Commission ("HCRC")]."  *Id.* at PageID.19.[7]  She also alleges—presumably related to a retaliation claim—that the HSO hired another flutist on November 12, 2021, to perform a solo flute part in a performance, and then "hired another flutist to play in her stead from May 24, 2022, through July 3, 2022."  *Id.* at PageID.15.  These hirings allegedly were in violation of "contract and custom" entitling McGinn "to a right-of-first refusal to accept solo performances as [the] HSO's Principal Flutist."  *Id.* at PageID.14.

### 4.  *Allegations Against the Union*

The Complaint also makes various allegations specifically against Local 677 in support of McGinn's aiding and abetting claim under HRS § 378-2(a)(3).[8]  It alleges that "[i]n violation of its obligation to her and even though she repeatedly asked for help, Local 677 refused to assist Ms. McGinn with her requested accommodation and also failed to assist her after HSO placed her on indefinite unpaid leave."  *Id.* at PageID.18.

---

[7]  The Complaint does not allege when she filed her EEOC/HCRC charge, although it alleges that right-to-sue notices were issued on July 13, 2023, and July 18, 2023.  ECF No. 1 at PageID.4–5.

[8]  Section 378-2(a)(3) provides that "it shall be an unlawful discriminatory practice: . . . For any person, whether an employer, employee, or not, to aid, abet, incite, compel, or coerce the doing of any of the discriminatory practices forbidden by [§ 378-2] . . . ."

It also alleges that "Local 677 pre-planned and/or coordinated [t]he Call with HSO where its representative, Ms. Jaccoma, publicly shamed, bullied, and discriminated against Ms. McGinn on the basis of her medical disability and religion," that "Defendants knew before the Call that Ms. Jaccoma would behave in this unacceptable manner," and that "after [t]he Call, Defendants did not condemn Ms. Jaccoma for her unacceptable discriminatory remarks, nor did they apologize to Ms. McGinn for them." *Id.* at PageID.28.

And it alleges "[a]s further evidence of [Local 677's] aiding and abetting HSO's unlawful discriminatory and retaliatory acts against Ms. McGinn, and even though Local 677 is obligated to do so, it failed to represent or assist Ms. McGinn secure her requested accommodations from the Policy, and it did not help her get her job back when HSO placed her on indefinite unpaid leave." *Id.* at PageID.29.  Local 677 allegedly failed to do so "even though Ms. McGinn repeatedly requested assistance from Local 677 for help with these issues." *Id.*

## B.    Procedural Background

Plaintiff timely filed this suit on October 10, 2023, after she received right-to-sue letters from the EEOC and HCRC on July 13, 2023, and on July 18, 2023 respectively. *Id.* at PageID.4–5.  The Union filed its Motion to Dismiss on December 15, 2023.  ECF No. 20.  McGinn filed her Opposition on January 12, 2024, ECF No. 25, and the Union filed a Reply on January 25, 2024, ECF No. 29.

The HSO filed its Motion to Dismiss on December 21, 2023.  ECF No. 22.

McGinn filed her Opposition on January 12, 2024, ECF No. 26, and the HSO filed

a Reply on January 24, 2024, ECF No. 30.  The court heard oral argument on both

Motions on February 7, 2024, along with oral argument in *Gallagher v. Honolulu*

*Symphony Orchestra*, Civ. No. 23-00395 JMS-RT.

## III.  <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss

for "failure to state a claim upon which relief can be granted."  A Rule 12(b)(6)

dismissal is proper when there is either a "lack of a cognizable legal theory or the

absence of sufficient facts alleged."  *UMG Recordings, Inc. v. Shelter Capital*

*Partners, LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting *Balistreri v. Pacifica*

*Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).  Rule 12 is read in conjunction

with Rule 8(a)(2), which "requires only 'a short and plain statement of the claim

showing that the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555 (2007) (citation and internal quotations omitted).

To survive a Rule 12(b)(6) motion to dismiss for failure to state a

claim, a complaint must offer "more than labels and conclusions," and instead

contain "enough factual matter" indicating "plausible" grounds for relief, not

merely "conceivable" ones.  *Banks v. N. Tr. Corp.*, 929 F.3d 1046, 1055–56 (9th

Cir. 2019) (citing *Twombly*, 550 U.S. at 555–56).  And in a Rule 12(b)(6) analysis,

the court accepts as true the material facts alleged in the complaint and construes

them in the light most favorable to the nonmovant.  *Steinle*, 919 F.3d at 1160.

## IV.  <u>DISCUSSION</u>

### A.    The Court Will Consider Information Regarding COVID-19, the Mayor's Proclamation, the Master Collective Bargaining Agreement and Related Documents, and McGinn's April 2022 NLRB Charge

Initially, McGinn challenges Defendants' use in these proceedings of

certain exhibits attached to their Motions to Dismiss—documents or other

information not specifically referred to in the Complaint.  Specifically, McGinn

objects to the Union's reliance on her April 22, 2022 charge filed against the Union

with the National Labor Relations Board ("NLRB") and the NLRB's

corresponding April 25, 2022 notice to the Union.  *See* ECF No. 20-5 at

PageID.166–70.  McGinn also objects to the use of (1) data from the State of

Hawaii Department of Health regarding COVID-19 as of December 13, 2023

("COVID-19 data"), and (2) the Mayor's Proclamation.  *See* ECF No. 22 at

PageID.218; ECF No. 22-4; ECF NO. 26 at PageID.471–73.

As this court analyzed in *Gallagher*, the court takes judicial notice of

the COVID-19 data and the Mayor's Proclamation.  *See* 2024 WL at 1331799, at

*6–7 (applying *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018)

and Federal Rule of Evidence 201 to the same information).  The COVID-19 data

and the Mayor's Proclamation are matters of public record, and the publication of

the figures and contents are not subject to dispute.[9]

Similarly, the court takes judicial notice of the April 2022 charge that

Plaintiff filed with the NLRB (and the NLRB's corresponding notice to the Union).

*See, e.g.*, *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) ("Courts may

take judicial notice of . . . the 'records and reports of administrative bodies.'")

(quoting *Interstate Nat. Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir.

1953)); *Avila v. Sheet Metal Workers Loc. Union No. 293*, 400 F. Supp. 3d 1044,

1056 n.6 (D. Haw. 2019) (explaining that charges issued by the [NLRB] . . . may

be judicially noticed as public records"); *Overby v. Int'l Longshore & Warehouse*

*Union Loc. Chapter Eight*, 2018 WL 7200662, at *2 (D. Or. Dec. 14, 2018) (taking

judicial notice of an unfair labor practice claim filed with the NLRB); *Medley v.*

*Atl. Exposition Servs., Inc.*, 550 F. Supp. 3d 170, 184 (D.N.J. 2021) (taking judicial

---

[9] The Motions to Dismiss also rely on (1) the Master Agreement between the HSO and Local 677, ECF Nos. 20-3; 22-5 & 22-6; and (2) related Local 677 documents, including the union's "COVID-19 Protocols for 2021-2022 (Effective 10/25/2021)," ECF Nos 20-4 & 22-7. McGinn, however, does not object to the citation to the Master Agreement or the HSO's COVID-19 Protocols.

In any event, the Master Agreement and the COVID Protocols fall within the incorporation-by-reference doctrine. Some of the COVID Protocols (referred to in the Complaint as "the Policy") are cited in the Complaint and form, at least in part, "the basis of the plaintiff's claim." *Khoja*, 899 F.3d at 1002; *see, also, e.g.*, ECF No. 1 at PageID.6 (Complaint describing various provisions of the COVID Policy, which "HSO imposed [as] a new term of employment on its musicians"). Further, the court will allow the HSO to rely on provisions of the Master Agreement that are not subject to dispute because the Complaint also makes clear that the COVID Protocols were adopted as part of Local 677's CBA, and the Complaint relies on related union matters such as the relationship between the Union and the HSO. *See, e.g.*, *id.* at PageID.7, 15 nn. 5 & 6.

notice of NLRB charges in examining a statute of limitations defense at a motion to dismiss).

To be clear, the court is not taking judicial notice of any of the allegations within the NLRB charge, but is only taking notice of the fact and date of Plaintiff's filing of the NLRB charge.  *See Khoja*, 899 F.3d at 999 (explaining that although a court may take judicial notice of matters of public record, it "cannot take judicial notice of disputed facts contained in such public records").

## B.    The Union's Motion as to Count VIII for Aiding and Abetting

Local 677 moves to dismiss the HRS § 378-2(a)(3) claim for "aiding and abetting," arguing that because McGinn's allegations amount to a federal breach of a duty of fair representation claim, the claim is preempted by the NLRA. ECF No. 20 at PageID.95–100.

### 1.    *The Aiding and Abetting Claim Is Preempted Under the NLRA*

The Union has a duty of fair representation that arises from section 9 of the NLRA, 29 U.S.C. § 159(a), which grants unions roles as "exclusive bargaining representative[s] for all of the employees in a given bargaining unit." *Peterson v. Kennedy*, 771 F.2d 1244, 1253 (9th Cir. 1985).  "[T]he duty of fair representation requires a union 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.'"  *Marquez v. Screen*

20

*Actors Guild, Inc.*, 525 U.S. 33, 44 (1998) (quoting *Vaca v. Sipes*, 386 U.S. 171,

177 (1967)).  "In other words, a union breaches the duty of fair representation

when its conduct toward a member of the bargaining unit is arbitrary,

discriminatory, or in bad faith."  *Id.* (citations omitted).  The duty of fair

representation applies to all union representational activity, including the

"negotiation, administration, and enforcement of [CBAs]."  *Int'l Brotherhood of*

*Electrical Workers v. Foust*, 442 U.S. 42, 47 (1979); *see also Air Line Pilots Ass'n,*

*Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) ("[The] duty of fair representation . . .

applies to all union activity, including contract negotiation.").

    To achieve the federal policy of enforcing a duty of fair

representation, state laws that could interfere with that policy are preempted by the

NLRA.  As the Ninth Circuit recognized in *Adkins v. Mireles*, 526 F.3d 531, 539–

40 (9th Cir. 2008) (internal citations omitted):

> [t]he federal statutory duty which unions owe their
> members to represent them fairly also displaces state law
> that would impose duties upon unions by virtue of their
> status as the workers' exclusive collective bargaining
> representative. . . .  To bring a successful state law action,
> aggrieved workers must make a showing of additional
> duties, if they exist, beyond the normal incidents of the
> union-employee relationship.  Such duties must derive
> from sources other than the union's status as its
> members' exclusive collective bargaining representative,
> such as an express provision of the collective bargaining
> agreement or a collateral contract.

Courts can therefore "recharacterize" state law claims that challenge a union's representational activities as a federal breach of fair representation claim. *See, e.g.,* *Guidry v. Marine Engineers & #039 Beneficial Ass'n*, 2012 WL 646302, at *3 (N.D. Cal. Feb. 28, 2012) (addressing whether "re-characterization of a plaintiff's state law claims is required when the claims challenge a union's representational activities").

Other Circuits agree that such state law claims are subject to preemption. *See, e.g.*, *BIW Deceived v. Local S6, Indus. Union of Mar. & Shipbuilding Workers of Am.,* 132 F.3d 824, 830 (1st Cir. 1997) ("[S]tate law is preempted whenever a plaintiff's claim invokes rights derived from a union's duty of fair representation."); *id.* at 831–32 (holding that a district court possesses federal question jurisdiction when a complaint, though "garbed in state-law raiment, sufficiently asserts a claim implicating the duty of fair representation"); *Richardson v. United Steelworkers of Am.,* 864 F.2d 1162, 1166–67 (5th Cir. 1989) ("Because the plaintiffs in this case alleged that the Union breached a duty that arose from its status as their exclusive collective bargaining agent under the NLRA, *Vaca* requires that this duty be defined by federal law.") (citing *Vaca*, 386 U.S. at 918); *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1158 (10th Cir. 2000) (holding that state law claims framed as wrongful discharge and civil conspiracy accusing the National Association of Letter Carriers of acting in concert

with the employer to discriminate against a plaintiff due to his religion were preempted by the NLRA).[10]

Applied here, the facts alleged in McGinn's Complaint against the Union for "aiding and abetting" implicate the Union's duty of fair representation. The Complaint alleges that although McGinn "repeatedly asked for help, Local 677 refused to assist Ms. McGinn with her requested accommodation and also failed to assist her after [the] HSO placed her on indefinite unpaid leave." ECF No. 1 at PageID.18. It alleges that the Union "failed to represent or assist Ms. McGinn secure her requested accommodations from the Policy, and it did not help her get her job back when [the] HSO placed her on indefinite unpaid leave . . . even though Ms. McGinn repeatedly requested assistance from Local 677 for help with these issues." *Id.* at PageID.29. These allegations plainly allege that the Union failed to represent her.

Further, the Complaint's allegations that the Union "collud[ed] with [the] HSO during the summer of 2021 to formulate and impose the Policy," and "pre-planned and/or coordinated [t]he Call with [the] HSO where its

---

[10] As it emphasized at oral argument, the Union limited its argument to preemption under § 9 of the NLRA. That is, the Union did not argue that Count VIII is preempted under § 301 of the Labor Management Relations Act, which preempts state law claims that are "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985), or state-law claims that depend upon the meaning of a term in a CBA. *See Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–06 (1988).

representative, Ms. Jaccoma, publicly shamed, bullied, and discriminated against

Ms. McGinn," *id.* at PageID.28, also concern the "negotiation, administration, and

enforcement of [the CBA]." *Foust*, 442 U.S. at 47.  With the Union's knowledge

of Jaccoma's actions, the allegations describe conduct towards McGinn that was

"arbitrary, discriminatory, or in bad faith" in the Union's role as bargaining

representative under the CBA.  *Marquez*, 525 U.S. at 44; *see also Vaca*, 386 U.S.

at 177 (stating that a duty of fair representation requiring a union to "serve the

interests of all members without hostility or discrimination").  The claim "is

inextricably linked to [the Union's] performance of duties owed in [its] capacity as

union representative[]." *Adkins*, 526 F.3d at 541.  And so, the claim—although

labeled as "aiding and abetting" discrimination under state law—is in actuality a

federal fair representation claim, and is therefore preempted.  The court thus

GRANTS the Union's Motion to Dismiss as to preemption.[11]

---

[11]   To be clear, Count VIII is dismissed (without prejudice) because it pleads a state law cause of action that is preempted.  That is, the court is not automatically "substitut[ing] a federal cause of action for the state cause of action." *Smart v. Local 702 Int'l Brotherhood of Elec. Workers*, 562 F.3d 798, 803 (7th Cir. 2009).  Nor is the court "read[ing] into [the] complaint elements that the plaintiff omitted," and "constru[ing] the complaint as if it raised the federal claim that actually underlies the plaintiff's suit." *Sullivan v. American Airlines, Inc.*, 424 F.3d 267, 271–72 (2nd Cir. 2005).  "Recharacterizing" a complaint to substitute a federal cause of action appears limited to situations of *complete* preemption where "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purpose of the well-pleaded complaint rule.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) (quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)).  Like other Circuits, "[the Ninth] Circuit has distinguished between recharacterization for jurisdictional purposes and for federal preemption purposes[.]" *Stewart v. U.S. Bancorp*, 297 F.3d 953, 958 (9th Cir. 2002).  "'The recharacterization of a state claim as

(continued . . . )

To clarify, the court is not concluding that any state-law claim for discrimination against the Union is necessarily preempted as a matter of law. Rather, applying *Adkins*, a state law claim is possible if it exists "beyond the normal incidents of the union-employee relationship," and "derive[s] from sources other than the union's status as its members' exclusive collective bargaining representative." 525 F.3d at 539–40; *see, e.g.*, *Martinez v. Kaiser Found. Hosps.*, 2012 WL 2598165, at *7 (N.D. Cal. July 5, 2012) (finding discrimination claim against a union under the California Fair Employment and Housing Act not preempted under § 9). But, to make a preemption determination, "the court must look to the *conduct* at the heart of the controversy." *Madison v. Motion Picture Set Painters & Sign Writers Local 729*, 132 F. Supp. 2d 1244, 1257 (C.D. Cal. 2000) (emphasis added) (citations omitted). Here, the gravamen of McGinn's Complaint is that the Union breached its duty of fair representation by failing "to represent or assist Ms. McGinn [to] secure her requested accommodations from the Policy, and it did not help her get her job back when HSO placed her on indefinite unpaid leave," ECF No. 1 at PageID.18, or otherwise acted in a manner that was

---

federal is independent from the process of finding that claim federally preempted.'" *Id.* (quoting *Schroeder v. Trans World Airlines, Inc.*, 702 F.2d 189, 192 (9th Cir. 1983) (brackets omitted)).

And it is well-settled that preemption under § 9 of the NLRA for breach of a duty of fair representation is ordinary defensive preemption, not complete preemption of all state-law claims. *See, e.g.*, *Adkins*, 526 F.3d at 538–39, 539 n.3; *Markham v. Wertin*, 861 F.3d 748, 759–61 (8th Cir. 2017) (rejecting the argument that the duty of fair representation completely preempts state law claims, finding such preemption to be a federal defense).

"arbitrary, discriminatory, or in bad faith" in its role as bargaining representative.
*Marquez*, 525 U.S. at 44.

The court will thus provide McGinn an opportunity to file an amended complaint if she can allege facts, in good faith, that would not constitute a breach of fair representation claim—or to re-allege Count VIII specifically as a federal breach of representation claim and clarify factual allegations in that light (and with the statute of limitations in mind, as discussed to follow).  That is, the court cannot say at this stage that further amendment would be futile.  *See, e.g.*, *Hoang v. Bank of America*, N.A., 910 F.3d 1096, 1102–03 (9th Cir. 2018) (reiterating that dismissal with prejudice and without leave to amend is not appropriate unless it is clear that any amendment would be futile).

### 2. *It Is Premature to Address the Union's Argument That a Fair Representation Claim Is Time-barred*

Considering Count VIII as a federal breach of fair representation claim, the Union next contends that the claim is time-barred (and if so, the court would need to address whether further amendment would be futile as to accrual of a limitations period).  Although a fair representation claim may indeed be time-barred, the court cannot so conclude at this motion-to-dismiss stage, at least as to some of the Complaint's allegations.  But because the court is otherwise allowing Plaintiff to amend Count VIII—possibly to clarify allegations as a federal fair representation claim—the court will deny the Union's Motion to Dismiss without

prejudice as to whether such a claim is or would be time-barred.  Nevertheless, because the statute of limitations is an important factor for a possible amendment, the court addresses the Union's arguments on the issue.

"A statute-of-limitations defense, if 'apparent from the face of the complaint,' may properly be raised in a motion to dismiss."  *Seven Arts Filmed Ent. Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (quoting *Conerly v. Westinghouse Elec. Corp.*, 623 F.2d 117, 119 (9th Cir. 1980)). Dismissal is proper "only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1045 (9th Cir. 2011) (citation and quotation marks omitted).  Courts "'accept as true all well-pleaded allegations of material fact' but are not 'required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.'"  *Seven Arts*, 733 F.3d at 1254 (quoting *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010)).

A claim for breach of duty of fair representation is governed by a six-month statute of limitations.  *See, e.g.*, *DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 169 (1983); *Stone v. Writer's Guild of Am. West, Inc.*, 101 F.3d 1312, 1314 (9th Cir. 1996); *Monez v. Operating Engineers Local Union*

27

*Member 3*, 2010 WL 5104823, at *3 (D. Haw. Nov. 29, 2010).  The six-month period begins to run "when the employee knows or should know of the alleged breach of duty of fair representation by a union."  *Kozy v. Wings West Airlines, Inc.*, 89 F.3d 635, 640 (9th Cir. 1996) (citation omitted).

McGinn's Complaint was filed on October 10, 2023.  *See* ECF No. 1. Taking judicial notice of McGinn's April 22, 2022 NLRB charge against the Union for "refusing to process [McGinn's] grievance for arbitrary or discriminatory reasons or in bad faith," ECF No. 20-5 at PageID.170, the Union argues that a claim for breach of duty of fair representation is, or would be, time-barred.  It argues that because McGinn knew enough as of April 2022 to file this charge, she must have known about an alleged breach of duty of fair representation well outside the six-month period prior to October 10, 2023, when this Complaint was filed.

The court, however, cannot conclude at this motion-to-dismiss stage that the *subject* of McGinn's April 2022 NLRB charge necessarily included the alleged arbitrary, discriminatory, bad faith conduct at issue in this case, e.g., the alleged conduct during "the Call," or the Union's failure to assist McGinn after she was placed on indefinite leave without pay.  All that the NLRB charge states is that "[w]ithin the previous six months, the above-named labor organization has restrained and coerced employees in the exercise of rights protected by Section 7

28

of the Act by refusing to process [McGinn's] grievance for arbitrary or discriminatory reasons or in bad faith."  ECF No. 20-5 at PageID.170.  It says nothing about the subject of that grievance.

The court could assume that a "refus[al] to process [McGinn's] grievance" included the allegations in this federal action, given that McGinn was put on indefinite leave without pay on December 10, 2021.  But McGinn conceivably could have been complaining about a completely unrelated instance of alleged arbitrary Union action.  Such assumptions about the April 2022 NLRB charge would not be clear from the Complaint's allegations or the NLRB charge itself.  And so, dismissing on statute of limitations grounds at this motion-to-dismiss stage (or finding amendment to be futile) would be improper.  *See Seven Arts*, 733 F.3d at 1254.  Such an analysis would require evidence—an inquiry perhaps more proper at a motion-for-summary judgment stage.

It is clear, however—even without considering the April 2022 NLRB charge—from the face of the Complaint that McGinn (1) knew on October 22, 2021 (the date of "the Call") about the Union's allegedly discriminatory behavior, (2) knew that the Union and the HSO had negotiated the CBA's COVID-19 Protocols prior to October 22, 2021, and (3) knew on December 10, 2021 that she had been placed on indefinite unpaid leave.  Any fair representation claims against

the Union based specifically on those events accrued in 2021—well before April 10, 2023 (six months before the filing of this action)—and would be time-barred.

But it's *not* clear from the Complaint's allegations when McGinn "repeatedly requested assistance from Local 677" to "help her get her job back" and when the Union failed to assist her in that regard.  ECF No. 1 at PageID.28.  It is not clear from the face of the Complaint (nor the NLRB charge) whether those alleged actions occurred outside the six-month limitations period.  Again, the court would need evidence to make such an analysis, something it cannot do at this motion-to-dismiss stage.

McGinn should thus be mindful of the six-month statute of limitations for a federal fair representation claim when deciding whether (and, if so, how) to file an Amended Complaint as to Count VIII.  If she chooses to amend Count VIII as a federal claim, she should consider whether she can allege in good faith that any alleged breach of duty of fair representation occurred in the six months prior to October 10, 2023.  If she so amends, at that point, the Union could file an appropriate motion again challenging the timeliness of a fair representation claim if it disagrees with such allegations.

In short, the Union's Motion to Dismiss is GRANTED in part and DENIED without prejudice in part.

C.     **The HSO's Motion**

The second Motion, brought by the HSO, challenges all of Plaintiff's claims against it.  ECF No. 22.  Although some of the issues overlap, the court addresses the religious discrimination claims first (Counts III and IV), then addresses the disability discrimination claims (Counts I and II), followed by the retaliation and punitive damages claims (Counts V, VI, VII, and IX).

1.     *Title VII and HRS Chapter 378*

The HSO argues that the Complaint fails to state Title VII and HRS Chapter 378 claims for two reasons.

First, it argues the Complaint does not allege an "adverse employment action."  *See, e.g.*, *Storey v. Burns Intern Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (analyzing an "adverse employment action" element in addressing a motion to dismiss a Title VII claim); *cf. Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 655 (9th Cir. 2006) (reiterating, for purposes of the *McDonnell Douglas* burden-shifting analysis at summary judgment, that a prima facie case of a failure-to-accommodate Title VII claim requires, among other things, a showing that an employer "discharged, threatened, or otherwise subjected [plaintiff] to an adverse employment action").[12]

---

[12]  Although "an employment discrimination plaintiff need not plead a prima facie case of discrimination," *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002), to survive a motion to
(continued . . . )

31

Second, it argues that it could not have granted McGinn a religious exemption from the COVID-19 vaccination requirement because granting such an exemption would have constituted an "undue hardship" as a matter of law. The court addresses each argument in turn.[13]

### a.   Adverse Employment Action

The HSO argues that the Complaint, which alleges that McGinn was placed on unpaid leave for failing to vaccinate, fails as a matter of law because unpaid leave is not an adverse employment action. This argument applies to both McGinn's discrimination and retaliation claims. *See, e.g.*, *Berry*, 447 F.3d at 655 (setting forth elements of a prima facie Title VII retaliation claim); *Poland v. Chertoff*, 494 F.3d 1174, 1179–80 (9th Cir. 2007) ("To establish a claim of

---

dismiss, a complaint must nevertheless "state[] a plausible claim for relief" that "permit[s] the court to infer more than the mere possiblity of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). And a plaintiff who fails to allege an "adverse employment action" is not a person "claiming to be aggrieved" under Title VII, which provides in pertinent part that "a civil action may be brought . . . by the person claiming to be aggrieved." *Storey*, 390 F.3d at 764 & n.12 (quoting 42 U.S.C. § 2000e-5(f)(1)).

[13] The court agrees with the HSO that McGinn's Opposition improperly relies on the now-retired "no set of facts" standard in opposing a motion to dismiss in federal court. *See, e.g.*, ECF No. 26 at PageID.481–82 (relying on a standard derived from *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957) that a claim may be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). The "no set of facts" standard was abrogated by *Bell Atlantic v. Twombly*, 550 U.S. 544, 562–63 (2007), and *Iqbal*, 556 U.S. at 678. *See, e.g.*, *Johnson v. City & Cnty. of Honolulu*, 2023 WL 1993972, at *3 (D. Haw. Feb. 14, 2023) ("The 'no set of facts' pleading standard does not reflect current law [in federal court] . . . ."). Although it remains true that a complaint requires only "a short and plain statement of the claim," it nevertheless must be "plausible on its face," *Twombly*, 550 U.S. at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

retaliation, a plaintiff must prove that (1) the plaintiff engaged in a protected activity, (2) the plaintiff suffered an adverse employment action, and (3) there was a causal link between the plaintiff's protected activity and the adverse employment action.") (citation omitted).

The court rejected this argument in *Gallagher* and applies that same analysis here. *See Gallagher*, 2024 WL 1331799, at *9. The Ninth Circuit "define[s] 'adverse employment action' broadly," *Fonseca v. Sysco Food Servs. of Ariz.*, 374 F.3d 840, 847 (9th Cir. 2004) (citations omitted), and "take[s] an expansive view of the type of actions that can be considered adverse employment actions." *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000) (citations omitted). Imposing *indefinite* unpaid leave—as alleged here—certainly "negatively affects [an] employee's compensation." *Fonseca*, 374 F.3d at 847 ("[A]n adverse employment action exists where an employer's action negatively affects its employee's compensation.") (citation omitted).

As the court also recognized in *Gallagher*, there might be some situations where unpaid leave could itself constitute a reasonable accommodation. *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986). But unpaid leave can nevertheless constitute an adverse employment action here, especially where the unpaid leave was both involuntary and indefinite. *See, e.g.*, *Cox v. Nw. Regional Educ. Serv. Dist.*, 2024 WL 777598, at *8 (D. Or. Feb. 23, 2024)

33

("*Ansonia* is not on point and it does not hold that placement on extended or indefinite unpaid leave is not an adverse employment action as a matter of law."); *Zimmerman v. PeaceHealth*, 2023 WL 7413650, at *5 (W.D. Wash. Nov. 9, 2023) ("The fact that unpaid leave may, in certain circumstances and where requested, constitute a reasonable accommodation does not mean that it cannot also be an adverse action, particularly where the employee is placed on unpaid leave involuntarily.") (quoting *Steenmeyer v. Boeing Co.*, 92 F. Supp. 3d 1024, 1031 (W.D. Wash. 2015) (alteration omitted); *see also, e.g.*, *Magee v. Trader Joe's Co.*, 2020 WL 9550008, at *11 (D. Or. Sept. 1, 2020) ("[P]lacing an employee on unpaid leave involuntarily may be considered an adverse action."); *E.E.O.C. v. United Postal Serv. Inc.*, 2017 WL 3503676, at *5 (D. Ariz. June 19, 2017) (reasoning that forced unpaid leave in response to request for additional accommodations could constitute an adverse employment action); *Dawson v. Akal Sec. Inc.*, 660 F. App'x 504, 506 (9th Cir. 2016) ("The fact that unpaid leave may be a reasonable accommodation *when it is requested* 'does not mean that it cannot also be an adverse action, particularly where the employee is placed on unpaid leave involuntarily.'") (mem.) (quoting *Steenmeyer*, 92 F. Supp. 3d at 1031).

### b.    Undue Hardship

Next, the HSO argues that granting an exemption would have resulted in an undue hardship, an affirmative defense to a failure-to-accommodate claim.

This defense comes from Title VII's definition of "religion."  As applicable here, under Title VII (and similarly under HRS Chapter 378)[14] it is an unlawful employment practice for a covered employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ."  42 U.S.C. § 2000e-2(a)(1).[15]  And Title VII defines "religion" as including:

> all aspects of religious observance and practice, as well as belief, *unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship* on the conduct of the employer's business.

42 U.S.C. § 2000e(j) (emphasis added); *see also* 29 C.F.R § 1605.2(e) (defining undue hardship).

---

[14]  Under Hawaii state law, Hawaii Administrative Rules ("HAR") provide "undue hardship" as a defense to religious and disability discrimination.  *See* HAR §§ 12-46-187(a), 12-46-193(4), 12-46-147; *Janto v. Roman Catholic Church in State of Haw.*, 130 Haw. 347, 310 P.3d 1048, 2012 WL 2446149, at *5 (Haw. Ct. App. June 27, 2012) (mem. op.).  Likewise, the Rules provide a specific "direct threat" defense to disability discrimination if "a person with a disability posed a direct threat to the health or safety of the person or others cannot be eliminated or reduced by reasonable accommodation."  HAR § 12-46-193(5).

[15]  HRS § 378-2(a)(1)(A) also makes it an unlawful discriminatory practice, among other reasons, for any employer "to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment" because of religion (among other protected classes).

An undue hardship defense would also preclude liability premised on a failure to engage in an "interactive process" in this Title VII context.[16]  Although a failure to engage in an interactive process is not an independent claim in a Title VII case, it may constitute evidence of discriminatory animus.  *See Shahid-Ikhlas v. N.Y. & Presbyterian Hosp., Inc.*, 2023 WL 3628151, at *6 (S.D.N.Y. May 5, 2023) ("[T]o the extent that Plaintiff seeks to assert a [Title VII] claim based on Defendant's alleged failure to engage in an interactive process . . . the Court finds that there is no such independent claim."), *report and recommendation adopted*, 2023 WL 3626435 (S.D.N.Y. May 24, 2023); *cf. Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) ("[T]here exists no stand-alone claim [under the ADA] for failing to engage in the interactive process.  Rather, discrimination results from denying an available and reasonable accommodation.").  But "[i]f an employer can show that no accommodation was possible without undue hardship, it makes no sense to require that he engage in a futile act."  *E.E.O.C. v. Townley*

---

[16]  Similar to the ADA's specific interactive process requirement—as discussed later—under Title VII, an obligation to engage in some type of "interactive process" stems from a statutory requirement on the employer to "reasonably accommodate" religion without undue hardship.  *See Thomas v. Natl. Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 n.5 (10th Cir. 2000) ("The [ADA's] 'interactive process' rationale is equally applicable to the obligation to offer a reasonable accommodation to an individual whose religious beliefs conflict with an employment requirement.").  *Thomas* reiterated that "[t]he obligation to engage in an interactive process is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee."  *Id.* (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999).  *See also Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) (explaining that "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business").

*Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988); *see also id.* at 615 n.7 ("[The

Ninth Circuit has] often allowed an employer who has made no attempt at

accommodation to argue as justification 'undue hardship.'") (citation omitted).

"[A]n employer does not act in bad faith when it does not attempt an

accommodation it sincerely believes would cause it undue hardship." *Id.* at 615

n.7.

   *Groff v. DeJoy*, 143 S. Ct. 2279 (2023), recently clarified that to

demonstrate "undue hardship" an employer "must show that the burden of granting

an accommodation would result in substantial increased costs in relation to the

conduct of its particular business." *Id.* at 2295. *Groff*, addressing prior case law

that adopted a "de minimis" standard, clarified that an undue hardship defense

"means something very different from a burden that is merely more than de

minimis . . . ." *Id.* (analyzing 29 C.F.R § 1605.2(e), which uses the term "more

than de minimis cost" in addressing undue hardship). And the Supreme Court

explained that "courts must apply the test in a manner that takes into account all

relevant factors in the case at hand, including the particular accommodations at

issue and their practical impact in light of the nature, size and operating cost of an

employer." *Id.* (citation and internal editorial marks omitted).

   The HSO raises two types of undue hardship: "conflict with laws,"

and "endangering safety." The court addresses each ground in turn.

i.   Conflict with laws

The HSO contends that if it had granted McGinn an exemption as she requested then the HSO would have violated vaccination standards set forth in the Mayor's Proclamation.  *See* ECF No. 22 at PageID.230 (arguing that "[the] HSO would have been in violation of Order No. 2021-14, and thus at risk of being penalized if it allowed Plaintiff to work in-person, unvaccinated and untested"). The argument is based on a well-established principle that an employer cannot be forced to violate the law to accommodate religion or a disability.  Ultimately, however, this specific undue hardship defense does not apply here.

*Bolden-Hardge v. Office of California State Controller*, 63 F.4th 1215 (9th Cir. 2023), reiterated that, with private employers, "'an employer is not liable under Title VII for failure to accommodate when accommodating an employee's religious beliefs would require the employer to violate federal or state law' because 'the existence of such a law establishes "undue hardship.""'  *Id.* at 1225 (quoting *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830 (9th Cir. 1999)) (brackets omitted); *see also, e.g.*, *Riley v. N.Y. City Health & Hosps. Corp.*, 2023 WL 2118073, at *4 (S.D.N.Y. Feb. 17, 2023) (reiterating that "Title VII cannot be used to require employers to break the law" in addressing a religious challenge arising from a COVID-19 vaccine mandate) (citations omitted); *Hines v. Ellis Nursing Home, Inc.*, 2023 WL 7619035, at *3 (D. Mass. Nov. 14, 2023)

38

(addressing argument that "employers are not required to accommodate an employee [under the ADA] when the requested accommodation would constitute a violation of law").

Specifically, the HSO points to paragraph A of "Order 10: Safe Access Oahu," of the Mayor's Proclamation, which provided that "all covered entities shall not permit a full or part-time employee . . . to enter covered premises without proof of full vaccination." ECF No. 22-4 at PageID.289–90. Notably— although the Mayor's Proclamation did not include a specific exemption for disability or religious beliefs—Order 10 listed four "Exceptions" that allow individuals "to enter covered premises without proof of full vaccination." *Id.* at PageID.290. The second exception included "[f]ull or part-time employees . . . with proof of a negative COVID-19 test result taken within seven (7) days of entry into the covered premises[.]" *Id.* In short, testing was allowed in lieu of vaccination under the Mayor's Proclamation.

Initially, the Complaint is based on an alleged failure of the HSO to even consider McGinn's request for an exemption, and the HSO's alleged failure to engage in any sort of interactive process at all. *See* ECF No. 1 at PageID.11–20. The Complaint's operative theory is that the HSO unlawfully discriminated based on religion by ignoring her request for an exemption, essentially determining that any exemption would necessarily be an undue hardship. *See id.* at PageID.13–14.

39

The Complaint further alleges that, by refusing to consider McGinn's request for an exemption under the CBA's COVID-19 Protocols, the HSO refused to consider "her request for accommodation from the [Protocol's] covid shot requirement . . . ."  ECF No. 1 at PageID.11; *see also, e.g.*, *id.* ("Following the timely submission of her requested accommodation. . . .").  The Complaint thus equates—rather imprecisely—a request for an "exemption" to be the same thing as a request for an "accommodation."  Although there may be a difference between "exemption" and "accommodation" given the particular terms of the Protocols, the court—construing the Complaint in the light most favorable to the plaintiff—reads the Complaint to mean McGinn sought to avoid the vaccination requirement *with* testing in lieu of vaccinating (or at least the HSO should have engaged in an interactive process to consider testing).  If McGinn had sought to avoid vaccination *without* testing, then the HSO's conflict-with-law argument has validity because the HSO would have violated the Mayor's Proclamation with such an exemption.

As set forth earlier—for musicians who "must remove their face mask in order to perform" such as "wind and brass players," ECF No. 22-7 at PageID.381[17]—the CBA's COVID-19 Protocols would not have allowed McGinn

---

[17]  A section of the Protocols regarding face masks gave a testing exception to a masking requirement for "individuals in performative situations or while on camera being filmed [such as] wind and brass players or for singers and speakers when actively performing."  ECF No. 22-7 at PageID.381.  The Complaint alleges that "despite these express [Protocol] terms, Ms. McGinn was not given the option to mask or test."  ECF No. 1 at PageID.14.  But that exception applied

(continued . . . )

(a flutist) to avoid vaccination even if she had a valid religious belief or disability. *See id.*[18]  But allowing McGinn to test in lieu of vaccination—although inconsistent with the Protocols—would not necessarily violate the law in the Mayor's Proclamation.  It might well be true, as provided in the Protocols, that McGinn could have presented a "direct threat" to the health and safety of other

---

to *vaccinated* wind instrument musicians—masking was required "regardless of . . . vaccination status."  ECF No. 22-7 at PageID.381.  And so, under the Protocols, this exception to the masking requirement for wind players was inapplicable to McGinn, who was not vaccinated in the first place.

[18]  To repeat, the CBA's COVID-19 Protocols included the following Exemptions:

> **Exemptions:**
> Individuals who have received an exemption or who have not yet received a response from a timely application must provide a negative PCR COVID-19 test date stamped no longer than 48 hours before each entry at the HSO Office, Hawaii Theatre Center, Blaisdell Concert Hall, or all other venues the HSO is utilizing in an official capacity.  See the testing provision below.  *If an individual with an exemption who can play their instrument while wearing a face mask, refuses to be tested*, they will be placed on leave without pay status but will retain their medical and instrument insurance through July 3, 2022.  They may be permitted to return to work once these protocols are lifted, or they are in compliance with the protocols on a rolling basis; January 10, 2022, February 22, 2022, or May 16, 2022.
>
> *Individuals with an exemption that must remove their face mask in order to perform will not be able to utilize two levels of mitigation. This is considered a direct threat to the health and safety of the individual and others*.  Therefore, they will be placed on leave without pay status, but will retain their medical and instrument insurance through July 3, 2022. They may be permitted to return to work once these protocols are lifted, or they are in compliance with the protocols on a rolling basis; January 10, 2022, February 22, 2022, or May 16, 2022.

ECF No. 22-7 at PageID.380–81 (emphases added).

musicians or the public as an unvaccinated and unmasked musician.[19]  But this would be a *different* type of undue hardship.  That is, it would not mean that there was undue hardship due to a *conflict with law*.  It is a false premise that the HSO had no choice but to deny an exemption from the vaccine requirement that included testing or else be in violation of the Mayor's Proclamation (although granting an exemption would have violated the Protocols).

      ii.      Endangering other musicians and the public

Nevertheless, the HSO's other undue hardship argument may well have merit.  The HSO claims undue hardship because accommodating McGinn would have subjected other musicians and the public to an increased risk of COVID-19 infection and jeopardized health and safety.[20]  It argues that the HSO's overall musical performance would have suffered due to a lack of musicians who would have gotten sick or been unable to attend rehearsals.  It claims that the "HSO's audience is generally older" and thus patrons are at a higher risk for

---

[19]  At oral argument, Plaintiff's counsel argued that he recently discovered a type of mask designed for flutists.  That is, counsel implied that McGinn could have performed with a face mask.  Counsel acknowledged, however, that these are new allegations, and were not pled in the Complaint.  In any event, the Protocols also stated that face masks must "fit snugly against the sides of [the musician's] face with no gaps," and that "[f]ace masks with vents are not approved."  ECF No. 22-7 at PageID.381.

[20]  *See, e.g.*, Richard Read, *A Choir Decided to Go Ahead With Rehearsal.  Now Dozens of Members Have COVID-19 and Two are Dead*, Los Angeles Times (March 29, 2020), https://www.latimes.com/world-nation/story/2020-03-29/coronavirus-choir-outbreak [https://perma.cc/7CKM-53TR].

infections, turning performances into potential "super-spreader events."  ECF No.

22 at PageID.232–33.  But, although some or all of these assertions may well be

true, they are not based on evidence or sources that the court can consider at a

motion-to-dismiss stage, nor are the assertions apparent from the allegations of the

Complaint.

      Undue hardship is an affirmative defense and "a context-specific

standard."  *Groff*, 143 S. Ct. at 2297.  In deciding whether an accommodation

"would result in substantial increased costs in relation to the conduct of [the

HSO's] business," the court must "take into account all relevant factors . . .

including the particular accommodations at issue . . . in light of the nature, size and

operating cost of [the HSO]."  *Id.* at 2295.  And so, dismissal of the Complaint at

this motion-to-dismiss stage "is proper 'only if the defendant shows some obvious

bar to securing relief on the face of the complaint' or in 'any judicially noticeable

materials.'"  *Bolden-Hardge*, 63 F.4th at 1224–25 (quoting *ASARCO, LLC v.

Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014)).

      Given the standard reiterated in *Bolden-Hardge*—as obvious as it may

be given news reports and reliable sources of medical knowledge—the court is

unable to find as a matter of law *at this motion-to-dismiss stage* that the HSO is

entitled to this undue hardship defense.  The court has no knowledge, for example,

of the HSO's particular operations or performance limitations, nor those of a

symphonic orchestra generally.  Nor can it assume to know the demographics of the HSO's particular audience, much less the types and feasibility of changes a symphony could make to accommodate musicians.  Even if the court takes judicial notice of obvious facts such as that a flute is a wind instrument, it is not clear from the face of the Complaint and judicially-noticeable documents that the HSO is entitled to this undue hardship defense under *Groff* at this stage.  "This is a fact-intensive inquiry that cannot properly be decided on the limited record before this Court." *MacDonald v. Or. Health & Science Univ.*, ___ F. Supp. 3d ___, 2023 WL 5529959, at *8 (D. Or. Aug. 28, 2023) (denying motion to dismiss complaint alleging religious discrimination for failure to exempt plaintiff from COVID-19 vaccination requirement, and rejecting undue hardship defense based on substantial cost, and alleged inability to grant exemption without violating government regulations); *see also, e.g.*, *Zimmerman*, 2023 WL 7413650, at *10 (reasoning when evaluating undue hardship in a COVID-19 vaccination challenge, that "[t]he amended complaint, including the materials cited within it, is not sufficient to establish undue hardship . . . [but] a standard of review that allows for the consideration of evidence may yield a different outcome"); *Lee v. Seasons Hospice*, ___ F. Supp. 3d ___, 2023 WL 6387794, at *4 (D. Minn. Sept. 29, 2023) ("It may be true that accommodating plaintiffs by offering religious or medical exemptions would have increased the risk to staff and patients or damaged

44

Seasons' reputation—and it may be true that the increased risks or reputational damage would have been significant enough to create an undue hardship—but these are matters that cannot be resolved without a factual record.").

Accordingly, the HSO's Motion as to an undue hardship defense based on public and employee safety is DENIED.

### 2. *Disability Claims*

Next, the HSO moves to dismiss Counts I and II, which are claims for disparate treatment and failure to accommodate under Title I of the ADA (and the equivalent state law claims under HRS Chapter 378). Aside from undue hardship (just discussed), the HSO raises two other grounds to dismiss the disability counts: McGinn was not "disabled," and she was not subject to an "adverse employment action."

The two types of "discrimination" claims under the ADA Title I— "disparate treatment" and "failure to accommodate—are "analytically distinct." *Johnson v. Bd. of Trs. of Boundary Cnty. Sch. Dist. No. 101*, 666 F.3d 561, 567 (9th Cir. 2011). Nevertheless, "[o]ften the two claims, are, from a practical standpoint, the same." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139 (9th Cir. 2001). Such is the case here, where "the consequence of the [alleged] failure to accommodate" results in disparate treatment (such as indefinite unpaid leave). *See id.*; *cf. Flores v. DISH Network, LLC*, 2021 WL 2454036, at *12 (D.

45

Ariz. June 16, 2021) (recognizing the two claims were similar "because [defendant's] alleged failure to accommodate resulted in disparate treatment," although the court analyzed them separately).

McGinn's main theory here appears to be that the HSO's failure to engage in any interactive process as required by the ADA is indicative of a discriminatory animus.  *See, e.g.*, *Snapp*, 889 F.3d at 1095 (reiterating that, although there is no stand-alone claim for failing to engage in the interactive process, "discrimination results from denying an available and reasonable accommodation"); *Sheng v. M&T Bank Corp.*, 848 F.3d 78, 87 (2d Cir. 2017) ("[A]n employer's failure to engage in a good faith interactive process can be introduced as evidence tending to show disability discrimination . . . .").

a.   *Was McGinn "Disabled"?*

Applicable to either type of ADA claim, the HSO argues that McGinn was not a person with a "disability" within the meaning of the ADA.  The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  The HSO argues that McGinn is not "disabled" because being unvaccinated against COVID-19 is not a disability.  *See, e.g.*, *Kerkering v. Nike, Inc.*, 2023 WL 5018003, at *2 (D. Or. May 30, 2023) ("Courts have invariably

46

rejected the theory that an individual's decision to forgo a vaccination constitutes a disability under the ADA.") (noting numerous cases)), *report and recommendation adopted*, 2023 WL 4864423 (D. Or. July 31, 2023); *Johnson v. Mount Sinai Hosp. Grp., Inc.*, 2023 WL 2163774, at *6 (E.D.N.Y. Feb. 22, 2023) ("Nor is the plaintiff's vaccination status a disability. . . .  The decision to vaccinate or not to vaccinate is a personal choice, while a disability under the ADA is not something a person chooses.").

McGinn, however, is not basing an ADA claim on her status as being unvaccinated.  Rather, she alleges that she "provided letters from medical professionals who stated that she suffers from life-long severe asthma, she experienced severe adverse reactions to influenza vaccines in the past, and that taking the covid shots would create for her a serious debilitating health risk."  ECF No. 1 at PageID.11.  Without anything contradicting that allegation—even if it appears questionable on its face—such conditions would not be "a personal choice."  *Johnson*, 2023 WL 2163774, at *6.

And the HSO has not argued that the combination of such alleged conditions does not "substantially limit one or more major life activities."  42 U.S.C. § 12102(1).  Some case law indicates that asthma, standing alone, does not constitute a disability.  *See, e.g.*, *Ellis v. Georgetown Univ. Hosp.*, 723 F. Supp. 2d 42, 48–49 (D.D.C. 2010) (concluding that plaintiff failed to demonstrate that her

asthma substantially limits the major life activity of breathing, where her asthma was well controlled by medication).  But other cases have required evidence to analyze whether asthma and alleged reactions to vaccines constitute an impairment that substantially limits a major life activity.  *See Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 165 (S.D.N.Y. 2020) (reasoning that "[d]oubtless, some reactions to vaccines can be severe enough in intensity, duration, frequency, or after-effects to rise to the level of a disability under the ADA," but finding that plaintiff "ha[d] not established that her reactions to the flu vaccine constituted a disability at the time of her requested accommodation").  Because the HSO did not otherwise address whether McGinn's condition constitutes a disability, the court does not reach the issue.

> b.    *Whether There Was "Adverse Employment Action"*

The HSO also argues—as it did with the Title VII claims—that McGinn failed to establish an "adverse employment action" because unpaid leave is not enough.

First, this court recognizes that some courts have held that an "adverse employment action" is not even required to state a claim under the ADA on a failure to accommodate theory.  *See Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 795 (10th Cir. 2020) ("[The Tenth Circuit has] made clear that an ADA failure-to-accommodate claim does not contain an adverse-employment-action

48

requirement.") (citations omitted); *id.* at 802 (requiring an "adverse employment action" in a failure to accommodate claim "would have the effect of significantly restricting the scope of the ADA's reasonable-accommodation obligation"); *Flores*, 2021 WL 2454036, at *13 n.8 ("Imposing a requirement of an 'adverse employment action' in a failure to accommodate [ADA] claim appears questionable. . . .  The Ninth Circuit model jury instructions recognize as much by not mentioning an 'adverse employment action' in setting forth the elements of a failure to accommodate [ADA] claim.").

Regardless, however, the court rejects this argument for the same reasons it rejected it as to a Title VII claim—placement on indefinite unpaid leave certainly affects compensation.  *See, e.g.*, *Fonseca*, 374 F.3d at 847 ("[A]n adverse employment action exists where an employer's action negatively affects its employee's compensation.") (citation omitted).

### 3.    *The Complaint States Plausible Claims for Retaliation in Part*

A prima facie retaliation claim under Title VII requires that (1) the plaintiff "have engaged in a protected activity," (2) the plaintiff "suffered an adverse employment action," and (3) "there was a causal link" between the protected activity and the adverse action.  *Stegall v. Citadel Broad. Co.*, 350 F.3d

1061, 1065–66 (9th Cir. 2003) (citation omitted).[21]  The first requirement is based

on 42 U.S.C. § 2000e-3(a), which provides:

> Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings
>
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has *opposed* any practice made an unlawful employment practice by this subchapter, or because he has *made a charge, testified, assisted, or participated* in any manner in an investigation, proceeding, or hearing under this subchapter.

(Emphases added).

The first clause ("opposed any practice made unlawful") is known as

the "opposition clause," and the second clause ("made a charge, testified, assisted,

or participated") is known as the "participation clause."  *See, e.g.*, *Crawford v.*

*Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 274 (2009).

---

[21]  Although a prima facie case is "an evidentiary standard, not a pleading requirement," *Swierkiewicz*, 534 U.S. at 510, the court may still consider those elements in determining whether a complaint pleads sufficient factual allegations to state a plausible claim of retaliation. *See, e.g.*, *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016) ("[Plaintiff's] retaliation claim may survive [defendant's] motion to dismiss if she pleads sufficient factual allegations to raise a reasonable expectation that discovery will reveal evidence of the following elements: (1) she engaged in conduct protected by Title VII; (2) the employer took adverse action against her; and (3) a causal link exists between her protected conduct and the employer's adverse action."); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d. Cir. 2015) ("[F]or a retaliation claim to survive a motion for judgment on the pleadings or a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) "because" he has opposed any unlawful employment practice.").

Retaliation under the ADA is similar.  *See, e.g.*, *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004) ("To establish a prima facie case of retaliation under the ADA, an employee must show that: (1) he or she engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two."); *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 473 (9th Cir. 2015) (applying a Title VII framework for retaliation claims to the ADA).  And, like Title VII, the ADA requires protected activity for retaliation.  *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has *opposed* any act or practice made unlawful by [the ADA] or because such individual *made a charge, testified, assisted, or participated* in any manner in an investigation, proceeding, or hearing under [the ADA].") (emphases added).  Moreover, to satisfy the "causal link" for a retaliation claim under either Title VII or the ADA, a plaintiff must show that "desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) (applying a "but for" standard to Title VII retaliation claims); *see also Brenneise*, 806 F.3d at 473 (applying *Nassar* to ADA retaliation claims).[22]

---

[22] Likewise, a retaliation claim under HRS § 378–2 is subject to the same three-part test. *See, e.g.*, *Gonsalves v. Nissan Motor Corp. in Haw.*, 100 Haw. 149, 162, 58 P.3d 1196, 1210 (2002).

a.    *Protected Activity*

Plaintiff's "protected activity" is based on both (1) the "opposition clause" of § 2000e-3(a), *see* ECF No. 1 at PageID.26 (Complaint alleging that Plaintiff "engaged in the protected activity of requesting an accommodation from the Policy based on her medical disability"), and (2) the "participation clause" of § 2003e(3)(a), *see id.* (alleging that McGinn "engaged in the protected activity of filing her duel Charge of disability discrimination with the EEOC and HCRC after her request [for exemption] was denied").  She also alleges that "[t]here is a causal link between HSO's retaliatory and adverse employment actions . . . ."  *Id.*

As for the opposition clause, the Complaint's allegation that McGinn "engaged in the protected activity of requesting an accommodation from the Policy," *id.*, is ambiguous.  The court discussed a similar ambiguity in *Gallagher*. *See Gallagher*, 2024 WL 1331799, at *15.  To reiterate, if McGinn's claim is based solely on requesting an exemption as provided in the CBA's COVID-19 Protocols, then it is unclear how such a request would be "opposing" an unlawful practice—the Protocols contained the very request she was seeking.  But if McGinn is basing a retaliation claim on seeking an "exemption" greater than what the Protocols themselves otherwise provide—such as a religious-based accommodation from the testing component of the Protocols—then that kind of request might constitute "opposition" to the policy.

As the court recognized at the hearing (and in *Gallagher*), the Eighth Circuit has held that a request for an accommodation by itself is insufficient to constitute "opposing" an unlawful employment practice for purposes of a Title VII retaliation claim.  *See E.E.O.C. v. N. Mem'l Health Care*, 908 F.3d 1098, 1102–03 (8th Cir. 2018) ("Consistent with the plain meaning of the word 'oppose,' the initial request for a religious accommodation simply does not 'implicitly' constitute opposition to the ultimate denial of the requested accommodation."). Other courts, however, have decided otherwise, indicating that the question is contextual—in cases both under the ADA and for certain Title VII retaliation claims.  *See, e.g.*, *Enriquez v. Gemini Motor Transport LP*, 2021 WL 5908208, at *7 (D. Ariz. Dec. 14, 2021) (citing cases).  But the court will assume—given that the issue was neither raised nor briefed—that McGinn's request for an exemption in the context she alleges it was made (and construing the Complaint's allegations in Plaintiff's favor) can satisfy the "protected activity" aspect of her retaliation claims.

In any event, the Complaint also alleges facts indicating a retaliation claim could plausibly be based on the participation clause.  *See, e.g.*, ECF No. 1 at PageID.26 (Complaint alleging that McGinn "engaged in the protected activity of filing her [dual] Charge of disability discrimination with the EEOC and HCRC after [her] request [for exemption] was denied"); *id.* at PageID.19 (alleging that

"retaliatory treatment towards Ms. McGinn occurred only after and . . . directly as a result of the duel Charge she filed with the EEOC and HCRC").

        b.      *Causation—Whether the protected activity was a "but for" cause of adverse action*[23]

As the court also analyzed in *Gallagher*, the HSO next seeks to dismiss the retaliation claims based on a lack of causation.  It points out that the CBA's COVID-19 Protocols were implemented on October 22, 2021, a week prior to McGinn's October 29, 2021 request for an accommodation.  ECF No. 22 at PageID.235.  It thus argues that "there is no retaliation claim arising from a religion-neutral policy that had been established *before* Plaintiff made a religious accommodation [request]."  *Id.*

The HSO relies on reasoning set forth in *O'Hailpin v. Hawaiian Airlines*, 583 F. Supp. 3d 1294 (D. Haw. 2022), and other cases that have rejected retaliation claims in a vaccination context based on a lack of causation. *O'Hailpin*—decided with evidence at an injunctive-motion stage—reasoned in part that plaintiffs were unlikely to succeed on retaliation claims because any adverse employment action "appear[ed] to be unconnected to their [accommodation requests]."  *Id.* at 1311.  *O'Hailpin* explained:

> Indeed, the vaccine policy was established, as well as the
> consequences for failing to comply with the policy —

---

[23] The court has already addressed the HSO's challenge to the second element (adverse employment action).

54

> i.e., the adverse employment actions at issue here —
> before Plaintiffs submitted their [accommodation]
> requests. . . .   In other words, employees were subject to
> termination or unpaid leave for violating the policy
> irrespective of whether they submitted an
> [accommodation] request.

*Id.*  Another case in this district relied on similar rationale in rejecting an ADA

retaliation claim also based on a refusal to vaccinate against COVID-19.  *See*

*Cunningham v. Univ. of Hawaii*, 2023 WL 1991783 (D. Haw. Feb. 14, 2023).

*Cunningham* reasoned:

> Defendant enacted its COVID-19 policy, along with the
> punishments for noncompliance, before Plaintiff notified
> Defendant of his alleged ADA-based opposition to the
> policy.  The only reasonable inference is that Plaintiff
> would have faced these punishments for his failure to
> comply with the policy even if he had never said
> anything about the ADA.  Defendant's disciplinary steps
> "were not actions that Defendant undertook deliberately
> to aim at Plaintiff on the basis of [his] criticism of the
> policy."

*Id.* at *5 (quoting *Linne v. Alameda Health Sys.*, 2023 WL 375687, at *3 (N.D.

Cal. Jan. 24, 2023)), *aff'd*, 2023 WL 10351531 (9th Cir. Sept. 14, 2023) (mem.).

And courts across the country have applied that rationale in the same context.  *See,*

*e.g.*, *Librandi v. Alexion Pharmaceuticals, Inc.*, 2023 WL 3993741, at *8 (D.

Conn. June 14, 2023) (citing cases); *Hines v. Ellis Nursing Home, Inc.*, 2023 WL

7619035, at *5 (D. Mass. Nov. 14, 2023) (same); *Shklyar v. Carboline Co.*, 616 F.

Supp. 3d 920, 927 (E.D. Mo. 2022) (same).

This court agrees with those cases, and so retaliation based on a theory that McGinn was placed on indefinite unpaid leave as retaliation solely for requesting an exemption as set forth in the Protocols fails for lack of causation—under that theory, she was placed on indefinite unpaid leave for failure to comply with the Protocols, not because of any protected activity.

But McGinn is also alleging retaliation based on a theory that she was subject to adverse actions without the HSO even considering her request and instead ignoring a requirement—under either or both Title VII (religion) and the ADA—to engage in an interactive process. She claims the HSO ignored her request and retaliated after she made it. Specifically, she alleges that "[s]he was placed on indefinite unpaid leave without any interactive process after submitting her request, and based merely on a conclusory assertion that she was a threat to others when she [was] not. . . ." ECF No. 1 at PageID.26. She also alleges that "the retaliatory treatment continued for an extended period, and included [the] HSO's retaliatory use of covid testing, rotations, and its tardiness rules, and the hostile work environment which HSO allowed to exist. . . ." *Id.* This treatment allegedly occurred "[a]fter she was allowed to return to perform with [the] HSO in the summer of 2022," *id.* at PageID.18, and "only after and as a direct result of her requested accommodation from the Policy, and having [been] treated unlawfully after its submission, directly as a result of the [dual] Charge she filed with the

EEOC and HCRC." *Id.* at PageID.19.  At this stage, these are adequate factual allegations that state a plausible claim that discriminatory animus was a "but for" cause of adverse employment action.

In short, the HSO's Motion is GRANTED in Part and DENIED in part.  It is granted as to allegations that she was retaliated against for refusing to vaccinate (and leave to amend in this regard would be futile, given a lack of causation).  But a retaliation claim is otherwise plausible based on the allegations in the Complaint.

## D.   Count IX for Punitive Damages Is Dismissed as a Stand-Alone Count, Although Such Damages Remain as a Possible Remedy as Alleged in the Complaint

Finally, both Motions to Dismiss argue—and Plaintiff does not dispute—that a separate count for "Punitive Damages" can be dismissed because (although punitive damages are a possible remedy) there is no independent cause of action for punitive damages under Hawaii law.  *See, e.g.*, *Ross v. Stouffer Hotel Co.*, 76 Haw. 454, 466, 879 P.2d 1037, 1049 (1994) ("[A] claim for punitive damages is not an independent tort, but is purely incidental to a separate cause of action."); *Smallwood v. NCsoft Corp.*, 730 F. Supp. 2d 1213, 1236 (D. Haw. 2010)

(same).  As the court decided in *Gallagher*, the Motions to Dismiss are well-taken as to Count IX.  *See* 2024 WL 1331799, at *17.

      To be clear, the Motions have not argued that the facts as alleged do not justify an award of punitive damages—the court has not addressed those allegations.  Nor have the Motions argued that punitive damages are not an available remedy against a private employer under Title VII or the ADA.  *See, e.g.*, *Kolstad v. Am. Dental Assn.*, 527 U.S. 526, 534 (1999) (discussing availability of punitive damages against private parties under Title VII in 42 U.S.C. § 1981a(b)(1)).  Here, the court is only finding that there is no independent cause of action as alleged in Count IX of McGinn's Complaint.  To that extent, the Motions to Dismiss are GRANTED as to Count IX.  Count IX is DISMISSED as a separate cause of action, although the factual allegations supporting an award of punitive damages remain as to the HSO.

## V. <u>CONCLUSION</u>

      For the foregoing reasons, the Motions to Dismiss, ECF Nos. 20 & 22, are GRANTED in part and DENIED in part.  They are GRANTED as to Count IX alleging punitive damages alone.  The Union's Motion, ECF No. 20, is GRANTED with leave to amend, although the court does not reach whether a federal duty of fair representation claim is barred by the statute of limitations.  The HSO's Motion, ECF No. 22, is GRANTED in part as to certain retaliation allegations, but it is

DENIED in all other respects.  An Amended Complaint (restricted to amending

allegations as to a claim against the Union as set forth earlier) is due by **April 19,**

**2024**.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, March 29, 2024.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*McGinn v. Hawaii Symphony Orchestra, et al.*, Civ. No. 23-00415 JMS-RT, Order Granting in
Part with Leave to Amend, and Denying in Part (1) Defendant Musicians' Association of Hawaii, Local
677, American Federation of Musician's Motion to Dismiss, ECF No. 20; and (2) Defendant Hawaii
Symphony Orchestra's Motion to Dismiss, ECF No. 22